UNITED STATES of America, Appellee,

v.

Melvin Douglas PIEPGRASS, Tom H. McCandless and Wayne Hofhines, Appellants.

Nos. 23348, 23495, 23496.

United States Court of Appeals, Ninth Circuit.

Feb. 16, 1970.

As Modified on Denial of Rehearing in Nos. 23348 and 23495 May 13, 1970.

Kenneth G. Berquist, Boise, Idaho, for appellants.

Sherman F. Furey, U. S. Atty., Clarence Suiter, Asst. U. S. Atty., Boise, Idaho, Jack Bookey, Seattle, Wash., for appellee.

Before HAMLIN, MERRILL, and ELY, Circuit Judges.

ELY, Circuit Judge:

Three individuals, jointly tried in the District Court, appeal from their respective convictions for fraud and conspiracy. The case involved several rather complex factual issues centering around an alleged conspiracy to commit fraud in the sale of securities. Each appellant asserts, in various contexts, that the evidence was not sufficient to support his conviction. From our reivew of the record, we have concluded that the judgments of conviction of two of the appellants must be affirmed and that the judgment as to the third, Hofhines, must be reversed.

It would be helpful, we think, first to outline the basic nature of the alleged conspiracy before discussing the evidence as it bears upon the individual appellants.

## THE BASIC SCHEME

On January 24, 1964, a corporation called Dairy Snow, Inc. (hereinafter DS) was organized under the laws of Idaho by M. D. Piepgrass, Vernon K. Smith, and Henry D. Scott, who were the incorporators and first directors. Piepgrass is one of the three appellants here, Smith was a leading Idaho attorney who is now deceased, and Scott was an insurance agent who was not charged as a defendant in that case. Piepgrass held two-thirds of the stock of the corporation, and Smith owned the other one-third.

Within a few days of the formation of DS, the same parties formed a second corporation, Dairy Snow Products, Inc. (hereinafter DSP). Three days later, the two corporations entered into a licensing and franchising agreement under which DSP was given permission to manufacture and market ice cream and related confections under tradenames claimed by DS. DS further agreed to provide services to DSP in planning and constructing production facilities and to furnish future tradenames, packages,

and recipes. In return DSP issued to DS two blocks of securities:

(1) One million shares of DSP common stock, giving DS control over DSP.

(2) A block of 2,000 "units," each unit consisting of a $100 bond of DSP, 100 shares of common stock, and an option on 100 shares of common stock at $1 per share. These units are referred to throughout as "301" units, 301 being the number of the certificate by which they were transferred.

On the same day that the licensing-franchising agreement was signed, the Board of Directors of DSP officially decided to make a public offering of DSP securities. It is the Government's contention that the scheme at this time consisted of a plan to sell DSP securities to the public and use the proceeds to pay off the debentures held by DS. The result of this scheme, if successful, would be to divert the funds of investors directly into the hands of the promoters.

The Government also contends that a similar scheme was instituted with respect to sale of the "301" units to the public under the guise of selling unissued securities. There were several "bonus" plans through which the appellants and others could obtain units for their personal accounts. Many of these particular units, part of the "301" block, ultimately found their way into the hands of the public. The economic effect of selling these personally held securities as if they were original-issue securities would be to siphon off company funds contrary to representations made to investors. These sales would also operate to create commissions and salaries in excess of the represented amounts set forth in the prospectus.

By the end of the year 1964, the sales campaign was considered completed, half of the DSP units having been sold to the public and the other half having been subscribed, some of these latter subscriptions apparently having been given by insiders who never paid them. At this time, it was determined to declare the first public offering closed and to make a second offering of DSP stock and stock options. The appellant Hofhines quit his association with the company at this time, apparently with some bitterness over his commissions, although the Government claims that he had continued to participate in an ongoing conspiracy.

The second offering consisted of "A" units (stock and stock options) as opposed to the "B" units involved in the original offering (the so-called "301" units were of the "B" type). The same sales group carried over from the original offering with the exception of Hofhines and the addition of one Mike Boulds, who ultimately became a Government witness. At the same time, however, Piepgrass formed a new corporation by the name of Investor Services, Inc. (hereinafter ISI), which was chartered as a securities brokerage office. The salesmen wrote some purchase orders through ISI for DSP "B" units, although that offering had been declared complete. The "B" units so sold were purportedly some that had become eligible for public sale because of defaults by subscribers. Many of those sold, however, were actually bonus units belonging to appellants Piepgrass and McCandless. This operation forms the basis for the Government's argument that the original 1964 conspiracy carried over through 1965.

The Government relies on one other type of transaction employed in marketing the "A" units to show that the entire series of events constituted a continuing conspiracy. In mid-1965 the first interest payments on the DSP debentures came due, but the company was desperately short of funds. Salesmen were sent out to deliver the interest checks with the hope of convincing the holders to reinvest the interest in more securities. This procedure allowed the company to remain in business after it actually became unable to meet its debts as they came due.

The extreme shortage of funds to which we have referred could be attributed to several factors, including the unrepaid advances to Piepgrass and the salesmen, as well as the diversion of funds through sale of the bonus units. The slight amount of dairy production that had begun in early 1965 ceased altogether by the end of that year. In September of 1966 the company was forced into bankruptcy.

## THE PROCEEDINGS BELOW

The indictment was filed against M.D. Piepgrass (an appellant herein), Lee Piepgrass, McCandless, Hofhines, and Boulds. Smith had died before the indictment was returned. The indictment consisted of seventeen counts: ten counts for fraud in the sale of securities [15 U.S.C. § 77q(a)], six counts for mail fraud [18 U.S.C. § 1341] and one general count for conspiracy [18 U.S.C. § 371]. The conspiracy count charged a single conspiracy, from January 1964 to February 1966, to commit securities and mail fraud as set forth in the first sixteen counts and alleged as overt acts the transactions enumerated in those counts plus an additional ten overt acts.

At the conclusion of the Government's case, the trial court dismissed several counts as to Lee Piepgrass and appellant Hofhines. On motion of the Government, the court also dismissed two counts, as against all defendants, for failure of proof. The ultimate disposition of all counts, as to each of the accused, is set forth in the margin.[1]

## PIEPGRASS

Appellant Piepgrass makes two related contentions on this appeal. Both are concerned with his intent and criminal knowledge. By referring to a few specific incidents in the course of the two years covered by the indictment, he attempts to demonstrate good faith and lack of guilty intent sufficient to negate inferences of criminal knowledge that could be drawn from the record. His second contention is that he relied on the advice of counsel in all the transactions during this period, and this also relates to his knowledge and intent.

The function of the reviewing court in determining the sufficiency of the evidence in a criminal conspiracy case was explicitly set out by the Supreme Court in Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942):

"It is not for us to weigh the evidence or to determine the credibility

1. 

| Count No. | Hofhines | M. D. Piepgrass | McCandless | Lee Piepgrass |
|---|---|---|---|---|
| (Securities Fraud) | | | | |
| I | Not Guilty | Hung-Dismissed | Not Guilty | Not Guilty |
| II | Not Guilty | Hung-Dismissed | Not Guilty | Not Guilty |
| III | Dismissed | Guilty | Guilty | Dismissed |
| IV | Dismissed | Guilty | Guilty | Dismissed |
| V | Dismissed | Guilty | Not Guilty | Not Guilty |
| VI | Dismissed | Guilty | Not Guilty | Not Guilty |
| VII | Dismissed | Guilty | Not Guilty | Dismissed |
| VIII | Dismissed | Hung-Dismissed | Not Guilty | Not Guilty |
| IX | Dismissed | Dismissed | Dismissed | Dismissed |
| X | Dismissed | Not Guilty | Not Guilty | Not Guilty |
| (Mail Fraud) | | | | |
| XI | Not Guilty | Not Guilty | Not Guilty | Not Guilty |
| XII | Dismissed | Hung-Dismissed | Hung-Dismissed | Not Guilty |
| XIII | Dismissed | Not Guilty | Guilty | Not Guilty |
| XIV | Dismissed | Dismissed | Dismissed | Dismissed |
| XV | Dismissed | Not Guilty | Not Guilty | Not Guilty |
| XVI | Dismissed | Guilty | Not Guilty | Dismissed |
| (Conspiracy) | | | | |
| XVII | Guilty | Guilty | Guilty | Hung-Mistrial |

For their convictions, the appellants were awarded suspended sentences and placed on probation for five years in addition to the following jail terms: Piepgrass, 8 months; McCandless, 6 months; Hofhines, 4 months.

of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances.' " (Citations omitted.) Id. at 80, 62 S. Ct. at 469.

The basic facts outlined above, pertaining to the formation of the two corporations, the transfer of DSP securities to DS, the structure of the bonus plan from the "301" units, the sale of those units for the benefit of the individuals, are all undisputed facts. It is also undisputed that these activities operated as a fraud.

Attempting to negate his guilty intent, however, Piepgrass emphasizes several transactions claimed by him to demonstrate his good faith and honest intentions. We have carefully considered the evidence relating to each of these transactions. While it might have supported the interpretation urged by Piepgrass, it is at least as consistent, if not more so, with the existence of a scheme to defraud as it is with Piepgrass' alleged good faith in attempting to begin a new enterprise. Moreover, even if these isolated incidents did positively demonstrate Piepgrass' good faith in certain respects they would not necessarily negate the existence of that criminal intent impliedly found by the jury in connection with the transactions upon which Piepgrass' convictions were based.

On the question of his reliance on advice of counsel, Piepgrass testified that he first approached attorney Smith with the idea of marketing dairy confections early in January 1964. The two men discussed the project at length during that month, and the enterprise was inaugurated on January 24th. The jury may have believed, as Piepgrass argues, that Piepgrass fully disclosed to Smith everything connected with the project and that Smith himself put together all of the details constituting the fraudulent

scheme. Even if this were the construction adopted by the jury, however, the fact is that Piepgrass participated. It was the jury's function to determine the issue of credibility and the existence, *vel non*, of fraudulent intent on the part of Piepgrass. In Bisno v. United States, 299 F.2d 711 (9th Cir. 1961), our court wrote:

"Advice of counsel is not regarded as a separate and distinct defense but rather as a circumstance indicating good faith which the trier of fact is entitled to consider on the issue of fraudulent intent." Id. at 719.

There is no contention by Piepgrass that the trial judge did not properly instruct the jury on the effect of reliance on the advice of counsel.

The jury could have interpreted the evidence offered by Piepgrass on the point as tending to show that, rather than consulting Smith as counsel and honestly following his advice, he conferred with Smith as one would confer with any business associate. Strengthening such an interpretation is the fact that Smith himself held a one-third interest in both corporations. It has been recognized that the interested attorney may be influenced, albeit honestly, by his personal interests. Shusan v. United States, 117 F.2d 110, 133 A.L.R. 1040 (5th Cir. 1941); see also Note, Reliance on Advice of Counsel, 70 Yale L.J. 978, 983 (1961). The jury was entitled to weigh the claim of reliance upon Smith's advice in the light of Smith's personal involvement in the enterprise.

### HOFHINES

■ Appellant Hofhines also makes two contentions before this court. The first is that the evidence is insufficient to support his conviction. The other is that the trial court erred in refusing to grant him a separate trial in view of the extent of the testimony which in no way related to him. Our review of the record has convinced us that Hofhines' contention as to the insufficiency of the evidence is well taken; hence, we do not reach his second argument.

At the close of the Government's case, the trial court dismissed as against Hofhines all those counts of the indictment which were based on transactions that took place after Hofhines left the company at the end of 1964. In addition, the Government itself moved to dismiss two counts for failure of proof. After these fourteen counts were dismissed, Hofhines was left charged with two counts of securities fraud, one count of mail fraud, and the overall conspiracy count. The jury returned a verdict of Not Guilty on the three substantive counts but Guilty on the general conspiracy count.

Hofhines' participation in the ill-fated venture began in April 1964. He was a stockbroker and had been contacted by Piepgrass in regard to selling the proposed issue of DSP. He had first declined on the ground that the proposed commission of 10% was too low. He apparently asked for 20%, which was the standard commission rate for small issues in Idaho at that time. As a result, the bonus plans were initiated by the directors of DSP.

Hofhines received seventy-five units of DSP securities under the bonus plans. All of these units eventually found their way into the hands of the public, but the manner in which they were transferred and Hofhines' beliefs in this regard are the crucial criteria of his guilt. The evidence showed only five transactions involving Hofhines or his bonus securities during the eight-month period that he acted as broker for the company. Of these five transactions, two involved orders that were filled partially with Hofhines' bonus units, one was a direct sale of bonus securities, and two were orders filled by stock belonging to Piepgrass and McCandless. The two in which his own stock were used to fill orders involved bonus units that he had pledged to the company as collateral for advances against commissions. The collateral was forfeited immediately, and Hofhines apparently made no attempt to repay the advances. On the other hand, the record convinces us that the one direct sale of his own stock was made in the good faith belief that he was free to sell those securities that he had already earned as commissions. The evidence in connection with the other two transactions does not establish that he knew anything about the activities of the other alleged conspirators. Three of these transactions, including the two involving the pledged securities, formed the basis of substantive counts on which Hofhines was found Not Guilty.

■ It is true, of course, that conspiracies must usually be proved through circumstantial evidence. The essence of the crime is the existence of a scheme, and there will rarely be direct evidence of plotting by the defendants. Diaz-Rosendo v. United States, 357 F.2d 124 (9th Cir. 1966). Of course, circumstantial evidence may well be as trustworthy as direct evidence, but we must be ever mindful that the requisite mental state in a prosecution for fraud is a specific intent to defraud and not merely knowledge of shadowy dealings.

■ Intent to defraud may be inferred from one's knowledge that the scheme operated in a deceitful manner, but the latter knowledge must be possessed by each individual. Phillips v. United States, 356 F.2d 297 (9th Cir. 1966). In addition, this court has remarked that mere "involvement in an unsavory, high-pressure, fly-by-night scheme" is not sufficient to establish "knowing participation in a scheme to defraud." Windsor v. United States, 384 F.2d 535 (9th Cir. 1967). The evidence against Hofhines, viewed in the light most favorable to the Government, tends to indicate nothing more than that Hofhines could have been aware that funds were being interchanged between the companies and individuals with a great deal of freedom and that from this awareness it can be inferred that he knew that the enterprise was operating as a deceit on the investors. It cannot be inferred from these "facts" that Hofhines had, beyond doubt, the requisite specific intent to defraud because the

logical relationship between what he *could have* known and a specific intent has no rational basis. The inferences are simply too tenuous to permit the jury to draw that conclusion. *See* United States v. Nelson, 419 F.2d 1237, 1242 (9th Cir. 1969).

## McCANDLESS

McCandless joined the enterprise at the same time as Hofhines, in early 1964. Unlike Hofhines, however, he remained a member of the sales force throughout the period covered by the indictment, including the second public offering of DSP and the alleged frauds involved in that offering. He was convicted not only of conspiracy but also of two counts of securities fraud and one count of mail fraud. On appeal, he makes the same contentions as Hofhines, that he should have been granted a separate trial and that the evidence was insufficient to support a conviction.

The three substantive counts on which McCandless was convicted were all dismissed against Hofhines by the trial court on the grounds that the transactions took place after Hofhines had left the company. The evidence on these counts tends to show a much higher degree of conscious deception on the part of McCandless than was shown as against Hofhines. In addition, the evidence on the conspiracy count deals with overt acts that show a much more uniform pattern of misrepresentation and knowledge than did the few transactions with which Hofhines was connected. The sales made in 1965, including those of the first "completed" offering and those using the "gimmick" of the interest checks, actually tend to indicate the formation of a new conspiracy, inaugurated at that time. The evidence was sufficient to warrant the determination that McCandless harbored culpable knowledge and intent.

■ Before the trial commenced, Hofhines and McCandless moved for severance under Rule 14 of the Federal Rules of Criminal Procedure, which pro-

vides for a separate trial if it appears that a defendant is prejudiced by joinder of defendants. Rule 14 does not relate to the propriety of the indictment but refers instead to the fairness of joinder in cases in which the evidence will jeopardize a co-defendant's right to a fair trial. As has often been pointed out, there is the danger of prejudice in any joint trial. Spencer v. Texas, 385 U.S. 554, 562, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967). But balanced against this inherent risk is the need for joint trials, especially in the context of the modern business conspiracy which often requires proof of activities over a period of several years. This proof may consist of documentary transactions that must be investigated by teams of experts and then explained in terms understandable to laymen. United States v. Borelli, 336 F.2d 376, 384 (2d Cir. 1964). Finally, there is a distinct possibility in many cases that without a joint trial there could be no trial at all. United States v. Cohen, 145 F.2d 82, 95 (2d Cir. 1944).

The problem is most acute when co-defendants are charged with both conspiracy and substantive counts of the same offense or offenses. Evidence that is inadmissible against certain defendants should not automatically become admissible because there is a conspiracy count in the indictment. Thus, the jury must be constantly and carefully instructed, as it was here, that evidence may eventually become admissible against other defendants on the conspiracy count, although it may remain inadmissible on the substantive counts as to the same defendants. Moreover, the trial judge must remain alert to the possibility of such prejudice that would require severance, at any stage of the trial, as to one or more defendants. *See generally* 8 Moore, Federal Practice ¶ 14.04 (2d ed. 1969).

■ It is recognized that the judge's function in a joint conspiracy trial is a delicate one, requiring the exercise of the utmost good judgment and involving decisions which are difficult to review. We do not need to accord these determi-

nations the finality that some courts have given them (See, e. g., Hall v. United States, 83 U.S.App.D.C. 166, 168 F.2d 161 (1948)), but it cannot be doubted that the trial judge is in the best position to make proper determinations on matters like that under discussion. The conduct of the trial is in his hands, and his decision on a question of severance should not be disturbed unless he has clearly abused his discretion. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954).

■ Here, there were four defendants named in the indictment. Almost all of the evidence related to the dealings of two of them, Piepgrass and McCandless. At no point in the trial did the evidence become so oriented to Piepgrass that the court could be deemed to have abused its discretion in continuing with the joint trial.

■ McCandless argues that even if joinder is considered proper in this case and if all the evidence was admissible against him on the conspiracy count, the court should have endeavored to marshal the evidence at the close of the trial and should have instructed the jury on precisely what evidence was admissible against him on each substantive count. *See* Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); United States v. Kelly, 349 F.2d 720 (2d Cir. 1965). It would doubtless have been desirable for the trial court to have made it clear to the jury exactly what was properly in evidence against each defendant, but we will not hold that it was reversible error for the court not to do so when McCandless made no such request during the trial. Fed.R.Crim.P. 52(b). *See* Lewis v. United States, 127 U.S.App.D.C. 115, 381 F.2d 894, 895 (1967) (Burger, J., concurring). At the close of the Government's case, the trial judge ruled that all evidence would be deemed admitted against all defendants. While the propriety of this broad ruling may be questionable, appellant McCandless points to no specific item of evidence that was improperly admitted against him.

The judgments of conviction against appellants Piepgrass and McCandless are affirmed.

The judgment of conviction against appellant Hofhines is reversed, and since it is clear that the evidence was fully developed, the indictment against Hofhines will, upon remand, be dismissed.

Affirmed in part; reversed and remanded in part, with directions.