UNITED STATES of America, Appellee,

v.

Lewis KATES, Appellant, et al.

No. 74–1805.

United States Court of Appeals, Third Circuit.

Argued Dec. 10, 1974.

Decided Jan. 28, 1975.

Robert E. J. Curran, U. S. Atty., Thomas A. Bergstrom, Walter S. Batty, Jr., Philadelphia, Pa., for appellee.

Donald J. Goldberg, Philadelphia, Pa., for appellant.

Before ALDISERT, ADAMS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This is an appeal from a conviction, under 18 U.S.C. § 371,[1] of conspiracy to defraud the United States and an agency thereof, the Department of Housing and Urban Development (HUD). The al-

leged conspiracy involved a scheme to rig estimates and to inflate billings in order to destroy competitive bidding on moving contracts and to overcharge the Philadelphia Redevelopment Authority (RDA) for the cost of moving displaced businesses. Under contracts with HUD, RDA was reimbursed by the federal government in whole or in substantial part for all the payments it was required to make for these moving costs.

The procedure for awarding contracts to movers and the outline of the alleged conspiracy are as follows: When the RDA condemned a particular area, it was obligated to reimburse condemned businesses for the cost of relocating. In order to facilitate competitive bidding for the moving contracts, the RDA had to require the condemnee to obtain and submit to it estimates from three separate movers of the cost of the move. In addition, the RDA had the option of soliciting an estimate itself from a fourth mover, as a check on the three solicited by the condemnee. The lowest estimate submitted would constitute a ceiling on the amount of reimbursement that the RDA was to pay, and the mover could recover only his actual costs if they turned out to be less than estimated. RDA inspectors were supposed to make periodic on-site inspections to determine that the mover was in fact using the same number of men and trucks as he claimed.

When one of the conspiring movers desired a particular job, he would determine what his own estimate would be and would then contact two other movers in the conspiracy and ask them to submit "courtesy bids" higher than his so that he would be the low bidder. When he learned that RDA would solicit a fourth bid, he would ask that mover to submit an inflated bid also. Often, he would pay a cash bribe, equal to ten percent of the estimated cost, to Edward

---

1. This statute provides:

   "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

Cavanaugh, RDA's Deputy Director of Commercial Relocation, so that the latter would select one of the conspirators as the fourth bidder. The mover who obtained this particular contract would reciprocate by submitting "courtesy bids" on contracts sought by other conspiring movers. He would also make further cash payments of five percent each to two RDA inspectors, Jack Simons and Leland Lamar, so that he could inflate his costs to bring them up to the estimate.

The evidence relating to Kates, an attorney for several displaced businesses, shows that he was at most only on the fringes of this conspiracy. While the conspiring movers rigged bids and padded estimates on countless numbers of moves, Kates was alleged to be involved with respect to about ten moves, and only when one of his clients was a condemnee. Furthermore, the evidence produced at trial, if believed, demonstrated only that appellant exacted ten percent payments from the movers in return for giving them his permission or approval to perform the moves of some of his clients. There was no testimony that Kates had any dealings with Cavanaugh, Simons or Lamar, that he was aware of the payoffs to them, that he was aware that the movers were inflating their billings to obtain higher profits themselves or that he was involved in any bid-rigging or cost inflation.

Nevertheless, at his second trial,[2] the jury returned a verdict of guilty, and Kates was sentenced to imprisonment for one year and one day and fined $10,-000. Because we believe the evidence insufficient to sustain a verdict that Kates was a participant in the conspiracy described above, we reverse.

■■■ We acknowledge that a defendant challenging the sufficiency of the evidence in a conspiracy case has a heavy burden. Since the jury has returned a verdict of guilty, we are required to view the evidence in the light most favorable to the prosecution.[3] Where the Government has established the existence of a conspiracy, as it has done here, "slight evidence may be sufficient to connect a defendant with it."[4] Furthermore, a formal agreement need not be established; rather, a defendant's involvement in the conspiracy may be inferred from circumstantial evidence.[5] The Government need not show that the defendant participated in every transaction[6] or even that he knew the identities of his alleged conspirators[7] or the precise role which they played.[8]

■■■ It is imperative, however, that we keep in mind the essential nature of what a conspiracy is in general and what this particular conspiracy was proven to be. It is well established that the "gist" of a conspiracy is an agreement.[9] However slight or circumstantial the evidence may be, it must, in order to be sufficient to warrant affirmance, tend to prove that the appellant entered into some form of agreement, formal or informal, with his alleged co-conspirators. Similarly, we have stated that the essence of a conspiracy is a "unity of purpose" or

**2.** The first trial ended in a mistrial when the jury was unable to agree on a verdict with respect to Kates. The first trial did result in guilty verdicts against co-defendants Cavanaugh, Simons, Lamar, and Stanley Salkowitz, head of a moving company.

**3.** Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. DeCavalcante, 440 F.2d 1264, 1273 (3d Cir., 1971).

**4.** *DeCavalcante, supra* at 1273; United States v. Cohen, 197 F.2d 26, 29 (3d Cir., 1954).

**5.** *Glasser, supra*, 315 U.S. at 80, 62 S.Ct. 457; United States v. Cudia, 346 F.2d 227, 229–230 (7th Cir., 1965).

**6.** United States v. Hutul, 416 F.2d 607, 619 (7th Cir., 1969).

**7.** United States v. Andolschek, 142 F.2d 503, 507 (2nd Cir., 1944).

**8.** Sears v. United States, 343 F.2d 139, 141 (5th Cir., 1965).

**9.** United States v. Falcone, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128 (1940).

"common design."[10] We must also find in this case that Kates knowingly entered into the conspiracy and that he had the specific intent to defraud the Government.[11] As the Court of Appeals for the Ninth Circuit stated in reversing a conspiracy conviction under this same statute, "we must be ever mindful that the requisite mental state in a prosecution for fraud is a specific intent to defraud and not merely knowledge of shadowy dealings." United States v. Piepgrass, 425 F.2d 194, 199 (9th Cir., 1970).

■ In our view, the evidence in this case tends only to establish that Kates was involved in kickback activities on his own, in which he demanded and received cash payments from heads of moving companies, all private individuals.[11a] His scheme operated independently of the conspiracy proved at trial, which was essentially a plan to frustrate the system established by the Government to ensure competitive bidding and to keep costs down. The conspiring movers acted with the specific intent to collect more money from the Government than that to which they were entitled and to make a mockery of the competitive bidding principle. The RDA officials played an integral role in this scheme by allowing the movers to overcharge the Government in return for cash bribes. Kates' activities, however, as disclosed by the evidence elicited at trial, bore no logical relationship to this conspiracy and were not necessary to further it. He could have insisted on and received the same "commissions" completely irrespective of whether the movers rigged their bids or inflated their bills for their own profit.

The evidence shows that he sought payments from private movers, not that he sought to obtain extra funds from the Government, and there is no evidence or any basis for inferring that Kates had any interest in the success of the conspiracy between the movers and the RDA officials. We therefore do not believe that the evidence establishes that Kates and the movers had a "unity of purpose" or "common design" or that Kates had the specific intent to defraud the Government.

The Government points to several facts adduced at trial which it claims provides circumstantial evidence of Kates' involvement in the conspiracy, but we believe that they are insufficient as a matter of law. The Government first notes that several movers testified that they paid Kates a ten percent "kickback fee" and that this pattern of activity was "identical" to that involving the RDA officials. However, Kates' receipt of ten percent cash payments was not "identical," as the prosecution argues, to the actions of Cavanaugh, Simons and Lamar. With respect to the RDA officials, the relationship between their receipt of the payments and the conspiratorial actions of the movers is obvious— those payments were necessary to induce the RDA officials to violate their responsibilities so that the rigging of bids and the inflation of billings would be possible. The payments to Kates, which by the movers' own testimony were at most designed to obtain moving contracts with Kates' clients, were for an entirely different purpose and bore no logical relationship to the workings of the conspiracy. Given this fundamentally different purpose, the mere similarity in the

**10.** *DeCavalcante, supra,* 440 F.2d at 1275; United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174, 182 (3d Cir., 1970); United States v. Lester, 282 F.2d 750, 753 (3d Cir., 1960), cert. denied, 364 U.S. 937, 81 S.Ct. 385, 5 L.Ed.2d 368 (1961). *See also* American Cyanamid Co. v. Sharff, 309 F.2d 790, 797 (3d Cir., 1962); United States v. Cudia, 346 F.2d 227, 230 (7th Cir., 1965).

**11.** *Cf.* United States v. Cangiano, 491 F.2d 906, 909 (2d Cir., 1974); United States v. Crimmins, 123 F.2d 271, 273 (2d Cir., 1941).

11a. We express no opinion whether his activities constituted a violation of state or some other federal law. Our role as a reviewing court, in the posture in which this appeal is presented, is to determine whether there was sufficient evidence to sustain a conviction under the specific offense for which he was charged, i. e., conspiring to defraud the Government.

amount and manner of payment is not sufficient to show that Kates and the others had a "common design" or that Kates, like the others, had the specific intent to defraud the Government.

For the same reason, the testimony by several movers that they could not get a job with one of Kates' clients without first paying him is not evidence that Kates conspired with the movers and the RDA officials to defraud the Government. Rather than being in furtherance of that conspiracy, his activities, as depicted by the evidence, are at least independent of it and perhaps even an obstruction to it. Similarly, the fact that Kates insisted that the movers pay him in cash, while accepting payments by check from his clients, does not tend to show that he was involved in this particular conspiracy to defraud the Government. That Kates may have wanted to conceal his transactions may tend to show that he was involved in an activity of dubious propriety, but not necessarily that he has part of the conspiracy charged. In fact, the only evidence in the record pertaining to Kates' motivation for insisting on cash was testimony by Jay Borowsky to the effect that Kates wanted cash so that he could avoid income tax payments (N.T. 233), and we note that this case does not involve alleged income tax evasion.

The Government also claims that Kates was well aware of the conspiracy and argues that his knowledge is evidence of his participation in it. As we stated earlier, however, mere "knowledge of shadowy dealings" is insufficient to infer that a defendant was part of the conspiracy. *Piepgrass, supra*, 425 F.2d at 199. While such knowledge may have some probative value by giving meaning to seemingly innocuous acts by the defendant, the evidence introduced at trial pertaining to Kates' knowledge of the workings of the conspiracy was too sketchy to warrant an inference by the jury that he shared its purpose and was

a part of it. Furthermore, we do not see any evidence of knowledge on Kates' part that his activities furthered a conspiracy to defraud the Government.

As noted earlier, there is no evidence that Kates had any dealings with Cavanaugh, Simons or Lamar or knew of their respective activities, that he was aware of the movers' payoffs to them, or that he was aware that the movers were inflating their billings. Similarly, while several movers testified that they raised their estimates and padded their bills in part to cover the cost of the payments to Kates, there is no testimony that Kates was aware that they were doing so and that the Government was being defrauded thereby. None of the immunized movers testifying for the Government ever stated that he told Kates about the conspiracy or any segment thereof, and all the conversations between Kates and the movers related solely to Kates' insistence on the ten percent commission.[12]

One mover, Jay Borowsky, testified that Kates was aware of the bid-rigging. However, Borowsky did not explain the basis on which he knew of Kates' knowledge of the bid-rigging, and he did not draw any connection between Kates' knowledge of it and his insistence on ten percent commissions. Also, contrary to the assertion by the Government, there is no testimony in the record that Kates was aware that the fourth or "check" bid was being abused.

The Government also argues that Kates was well aware that the movers paid bribes to the RDA officials, but we find no support for this in the record. The Government relies in part on the statement by Jack Albert, one of the movers, that Kates told him, after he had failed to obtain a moving contract, that Albert had not held "good enough cards at the Redevelopment Authority." This one ambiguous and unexplained statement is not sufficient evidence on which a jury could logically have decided that Kates was "well aware" that the

---

12. We note that a couple of the witnesses, Sydney Benjamin and John Ammazzalorso, testified that they paid Kates the money without specifically being asked for it, because they wanted to do work for Kates' clients.

movers were bribing RDA officials, and it certainly is an insufficient basis for concluding that Kates was part of the conspiracy to defraud. Nor is the other statement of Albert on which the Government relies sufficient to sustain a conviction. In that statement, Kates allegedly told Albert that in the future he would have to pay him (Kates) whether he got the move or not. Since that statement suggests that Kates was demanding payments on his own and was operating independently of the conspiracy to defraud, we do not believe that a jury could logically infer from it that Kates was part of the conspiracy charged.

In sum, we believe that the evidence is insufficient to support a jury finding that Kates entered into even an informal agreement with the movers and the RDA officials to defraud the Government. Far from showing that he and the others shared the "common design" of defrauding the Government, the evidence tends only to show that Kates operated independently of the conspiracy by insisting on payment from private movers for the right to move his clients, also private firms. His actions bore no necessary relationship to the conspiracy established at trial, and there was a paucity of evidence regarding Kates' knowledge of the workings of the conspiracy from which his participation in it might possibly have been inferred.

The judgment of the district court will be reversed.