UNITED STATES of America

v.

Dennis Richard TICHE.

Crim. No. 75–346.

United States District Court,
W. D. Pennsylvania.

Jan. 12, 1977.

Thomas A. Crawford, Jr., Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Thomas M. Kerr, Pittsburgh, Pa., for defendant.

## OPINION

COHILL, District Judge.

Defendants, Carmello Campisi, Dennis Richard Tiche and John Shaw were indicted for conspiracy to use the mails to defraud,[1] using the mails to defraud,[2] carrying explosives unlawfully during the commission of a felony,[3] making a firearm without paying the making tax thereon,[4] possessing an unregistered firearm,[5] possessing a firearm made in violation of the law,[6] and using an explosive to commit a felony.[7]

Prior to trial, Counts 2, 14, 15 and 16 were dismissed.

Campisi, in a plea bargain with the United States Attorney, pleaded guilty to three counts of mail fraud and agreed to testify for the government in return for the government moving for the dismissal of the other charges.

Shaw, in a plea bargain, pleaded guilty to Counts 1, 2 and 14 in the United States District Court for the District of Connecticut, and the remaining counts were dismissed at the time of sentence.

Defendant Tiche chose to waive trial by jury and was tried non-jury before this court from July 21 through July 23, 1976.

I

*Findings of Fact*

We make the following findings of fact:

Donald Nowe owned a lot on which were erected two buildings, known as 1312–14 and 1316–18 Spring Garden Avenue, Pittsburgh, Pennsylvania. Merrill Klein, a convicted arsonist or "torch man," who testified in this case, learned that Nowe "had a financial problem" and made a deal with Nowe to arrange a sale of the property. Nowe was to get $27,500 from the sale and Klein was to be allowed to keep anything that he could get over and above that price. Klein approached a friend, Nick Kerna, and suggested that he put up the money to purchase the building for "around $50,000." (Mr. Kerna died of a self-inflicted gunshot wound on May 25, 1974). Klein told Kerna that they could hold the property for a couple of months and then burn it down and collect perhaps as much as $250,000 in insurance.

Unfortunately for the plotters, Kerna did not have the money. Kerna thereupon approached Carmello Campisi, one of the defendants herein, and presented the plan to him. By deed dated April 17, 1969, Nowe conveyed the property to Campisi for $47,-500. Campisi put up $42,500 of his own money and obtained the other $5,000 from either Kerna or Klein or both of them. Nowe thus got the $27,500 he needed, and Klein received $20,000. Presumably neither Kerna nor Campisi knew about that aspect of the transaction.

Campisi arranged to insure the buildings through insurance broker Leonard Young. One building was insured for $45,000 and

1. 18 U.S.C. § 371 (Count 1)

2. 18 U.S.C. §§ 1341 and 2 (Counts 2 thru 12)

3. 18 U.S.C. §§ 844(h)(2) and 2 (Count 13)

4. 26 U.S.C. §§ 5861(f) and 5871 and 18 U.S.C. § 2 (Count 14)

5. 26 U.S.C. §§ 5861(d) and 5871 and 18 U.S.C. § 2 (Count 15)

6. 26 U.S.C. §§ 5861(c) and 5871 and 18 U.S.C. § 2 (Count 16)

7. 18 U.S.C. § 844(h), (i) (Count 17)

the other for $225,000. That insurance remained in force for about a year, and then Mr. Young placed the insurance with another company, the Insurance Placement Facility of Pennsylvania, Philadelphia, Pennsylvania. That policy covered the building for $225,000 and certain refrigeration equipment inside for $50,000.

Approximately six months after the purchase, Klein introduced Kerna and Campisi to a man identified only as "Mr. Marra." Klein recommended Mr. Marra as one who could be hired to destroy the building. Kerna discussed the idea with Marra, but the negotiations collapsed when Marra wanted to be paid in advance.

Subsequently Campisi, Kerna and Kerna's driver (one Al White) traveled to State College, Pennsylvania, where they met the defendant, Dennis Richard Tiche, and discussed the destruction of the building. At this time they gave Tiche a set of tires for his car so that he could drive to Pittsburgh to look over the building. Tiche was experienced in the use of blasting devices and explosives.

An agreement was reached, and Tiche was to be paid out of the insurance proceeds after the building was destroyed. Sometime before the fire Tiche came to Pittsburgh to look over the building.

The third defendant in this case, John Shaw, was an electrician and lived in the same apartment building as Tiche in State College, Pennsylvania. Tiche asked Shaw to help out with the fire and offered to pay him $500. Tiche stated that he (Tiche) was to get $2,500 for the job. Shaw accepted.

Tiche and Shaw then proceeded to make preparations for the arson. These preparations included purchasing, or otherwise obtaining several 24-hour, 110 volt timers, and a number of collapsible five-gallon containers. Tiche already had a set of walkie-talkie radios to use. At Tiche's parents' house in Boyers, Pennsylvania, they picked up electric blasting caps, dynamite, primer cord and a roll of electrical wire. They also purchased some ordinary plastic garbage cans. This was on Thursday, June 17, 1971. They later met two men named "Nick" and "Carl" at the Greyhound Bus Terminal in Pittsburgh and drove to the Spring Garden Avenue building in two cars.

At the building a man named "Al" was also present. They unloaded from the car the various things they had obtained, and Tiche and Shaw slept in the building that night.

The next day, Friday, they went to a Cameradio store and purchased a number of electrical items to use in connection with the arson. They also proceeded to dynamite holes in the floors of the building to create a "chimney effect" for the fire. Later that day they went back to Boyers, Pennsylvania, to Tiche's uncle's, and obtained a drum pump to be used to pump gasoline out of a 55 gallon drum into the five gallon containers. They spent the night at the home of Tiche's parents in Boyers.

On Saturday they returned to Pittsburgh, obtained more plastic containers, three infrared propane heaters, three 100 pound and three 25 pound cylinders of propane gas. They then proceeded to place the garbage cans filled with gasoline and the five gallon containers throughout the building and connected them with primer cord, which is an explosive-type rope. They later distributed the heaters and propane cylinders throughout the building.

On Sunday night and early Monday morning, June 20 and 21, 1971, after all of the items were distributed throughout the building and connected, Tiche remained in the building, and Shaw drove his car away from the building. The two were in communication via the walkie-talkies, and starting at the third floor and coming down, Tiche proceeded to light the propane heaters on each floor, reporting to Shaw by walkie-talkie as he did so. Tiche's last act was to set the timer, which was scheduled to detonate the primer cord and thence the gasoline one hour after it was set.

After setting the timer Tiche told Shaw via the walkie-talkie to drive by and pick him up, which Shaw did. They drove to the airport; then turned around and came back to the city. As they got to the general area

of the building, they saw a fire engine heading in the direction of the building; they saw a reddish-orange glow in the sky and heard an explosion which they assumed was one of the propane cylinders going off.

According to Pittsburgh Fire Department records the first alarm came in at 1:52 A.M., Monday, June 21, 1971.

They then returned to State College. Tiche and Shaw both were paid for their participation in the arson.

In connection with the obtaining of the insurance policy and making the fraudulent claim thereafter, the United States mails were used as follows: 1) the Insurance Placement Facility of Pennsylvania mailed a binder receipt to the Young Insurance Agency; 2) the Young Insurance Agency mailed a copy of the binder receipt to Campisi; 3) an application for a premium finance agreement was signed by Campisi and mailed by Young to ICDC, Inc., a premium financing company in Wilmington, Delaware; 4) a policy of insurance was issued by Insurance Placement Facility of Pennsylvania and on March 5, 1971, mailed by it to the Young Insurance Agency; 5) Young mailed the policy to Campisi; 6) after the building was destroyed Young mailed the notice of loss to Insurance Placement Facility of Pennsylvania; 7) a preliminary proof of loss was prepared by an attorney at Campisi's request, and mailed by the attorney to the insurance company; 8) a final proof of loss was prepared by the attorney, signed by Campisi and mailed to the General Adjustment Bureau; 9) General Adjustment Bureau mailed a proof of loss for $193,260 to Insurance Placement Facility of Pennsylvania; 10) Insurance Placement Facility of Pennsylvania mailed a check for $193,260 to Young on behalf of Campisi.

## II

### Motions

Defendant moved for Judgment of Acquittal at the close of the prosecution's case and again after all of the testimony was closed. Ruling on both motions was reserved until the receipt of a transcript and the filing of briefs.

### 1. Motion for Dismissal of Count 13

Defendant moves for the dismissal of Count 13 of the indictment (carrying explosives during the commission of a felony) on the grounds that the government failed to prove the explosives were in interstate commerce.

■ Count 13 charges the defendant with a violation of 18 U.S.C. § 844(h)(2) which provides in part:

"Whoever . . . carries an explosive unlawfully during the commission of any felony which may be prosecuted in a court of the United States, shall be sentenced to a term of imprisonment . . ."

No where does that particular provision make reference to interstate commerce. It is true, as defendant argues, that this section is in the Organized Crime Control Act, and one of the stated purposes of that Act is "to protect interstate and foreign commerce against interference and interruption . . ." Title XI, Pub.L. 91–452, § 1101 (See page 109 of 18 U.S.C.A. §§ 700 to 1080). We do not, however, find any hint in the statute that the explosives themselves must have been in interstate commerce. All that is required is that the explosives were used in the commission of a felony which may be prosecuted in a court of the United States.

The Motion to Dismiss Count 13 of the Indictment will be denied.

### 2. Motion for Acquittal because of Testimony of Co-conspirators

Defendant asserts that judgment of acquittal is mandated because the government's case is tainted by the testimony of "an array of scoundrels, liars and brigands."

■ The record reflects the circumstances under which Klein, Campisi and Shaw were testifying during the trial. Naturally these circumstances compelled close scrutiny of their testimony. We used our best efforts to be alert for inconsistencies in

their stories and to observe their demeanor on the witness stand.

■ There is no doubt that this testimony was admissible. *United States v. DeLarosa*, 450 F.2d 1057, at 1060–1061 (3d Cir. 1971), cert. denied 405 U.S. 957, 92 S.Ct. 1189, 31 L.Ed.2d 236 (1972).

■ Taking all of those factors into consideration, we were convinced beyond a reasonable doubt that they were telling the truth.

3. Motion for Acquittal because Tiche had No Knowledge of the Conspiracy

Defendant argued that no evidence established that he knew of the existence of the conspiracy or that he had the specific intent to defraud the insurance company. This is predicated upon the case of *United States v. Klein*, 515 F.2d 751 (3d Cir. 1975). In that case, the Court of Appeals held that where the evidence establishes that a defendant charged with mail fraud was unaware of the scheme to defraud the insurers, his innocent act of mailing a proof of loss claim to the defrauded insurers could not support a guilty verdict, in that there was no indication of specific intent on his part to defraud the insurers.

Unlike *Klein*, the credible evidence here establishes that defendant Tiche was not the innocent dupe of his alleged co-conspirators. It is clear that Tiche's acts in furtherance of the conspiracy cannot be characterized as "innocent" or "unknowing" in view of the fact that his acts caused the complete destruction of Campisi's building as they were intended by the conspirators to do.

■ To establish use of the mails to defraud under 18 U.S.C. § 1341, the government must prove the following essential elements: 1) a scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations or promises; 2) use of the mails for the purpose of executing the fraudulent scheme; and 3) culpable participation by the defendant in that defendant either made use of the mails himself or knowingly

caused someone else to make such use. *United States v. Brickey*, 296 F.Supp. 742 (D.Ark.1969), aff'd 426 F.2d 680 (8th Cir.), cert. denied 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970).

While there is dicta in *U. S. v. Dreer*, 457 F.2d 31 (3d Cir. 1972), to the effect that the elements of mail fraud under this section require that the defendant devise a scheme or artifice to defraud, use the mails and either send or receive mail connected with the scheme, we do not believe that such language requires the defendant actually to receive or to send mail connected with the scheme. This is particularly true in light of *United States v. Schall*, 371 F.Supp. 912 (W.D.Pa.), aff'd 503 F.2d 1400 (3d Cir. 1974), cert. denied 420 U.S. 993, 95 S.Ct. 1432, 43 L.Ed.2d 676, reh. denied 421 U.S. 972, 95 S.Ct. 1970, 44 L.Ed.2d 463 (1975), wherein mail fraud was recognized to have an extremely broad scope requiring that the government only prove the intention of devising a scheme to defraud and the use of the mails in furtherance of that scheme.

As noted by the court in *United States v. Cohen*, 516 F.2d 1358 (8th Cir. 1975), intent to defraud under the statute proscribing mail fraud is rarely susceptible of direct proof but must be inferred from the totality of facts and circumstances. While mere knowledge of shadowy dealings is, perhaps, insufficient to establish the specific intent to defraud, it is clear that the circumstances of Tiche's involvement here establish that he specifically knew that his intentional destruction of the building was for the purpose of obtaining proceeds from an insurance company. *United States v. Piepgrass*, 425 F.2d 194 (9th Cir. 1970).

■ The evidence in this case establishes that Tiche "caused" the mails to be used within the meaning of 18 U.S.C. § 1341. In *United States v. Grow*, 394 F.2d 182 (4th Cir.), cert. denied 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968), the court determined that where an individual does an act with knowledge that use of the mails will follow in the ordinary course of business or where such use can reasonably be foreseen even

though not actually intended, then he causes the mails to be used within the meaning of § 1341. See also *United States v. Maze,* 468 F.2d 529 (6th Cir. 1972), aff'd 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). It is immaterial that Tiche himself did not physically use the mails. *United States v. Adamo,* 534 F.2d 31 (3rd Cir. 1976).

■ The evidence in this case establishes that: 1) there existed a scheme or artifice to defraud the Insurance Placement Facility of Pennsylvania by means of false or fraudulent pretenses and representations; 2) the United States mails were used on various occasions for the purpose of accomplishing this scheme; and 3) defendant Tiche culpably participated in the use of the mails to defraud by knowingly causing others to make the use of those mails, preceding and following his intentional destruction of the building for the purpose of obtaining insurance proceeds.

We find therefore that defendant violated 18 U.S.C. § 1341.

### 4. Motion for Acquittal at the Close of All the Evidence

Defendant argues that the evidence adduced at trial is insufficient to establish his guilt of the charges alleged in the indictment. We have partially dealt with that assertion in the previous discussion of the testimony of the prosecution witnesses.

Defendant relies upon the testimony and evidence introduced in his case in chief, including the testimony of his sister, parents, uncle and himself. The credibility of those witnesses, the defendant and the prosecution witnesses as well, is, of course, a matter for the finder of fact. A trier of fact, whether a jury or judge:

> ". . . is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn."

*United States v. Cisneros,* 448 F.2d 298, 305 (9th Cir. 1971).

### III

### *Alibi Testimony*

■ Three particular items of evidence upon which defendant relies deserve comment. The first are certain "test-run sheets," compiled by defendant at State College in connection with his college thesis. These sheets consist of data interpretation, in the form of print-outs from a radio-active counting device. These sheets are relevant, asserts Tiche, because each contains a time-stamp indicating the date and time when it went through the counting mechanism. The second item of evidence consists of various entries in a pocket calendar kept by defendant during the year 1971. The third item is a phone bill indicating that on July 20, 1971, a call was placed from defendant's apartment in State College, Pa., to the residence of his wife's parents.

If these items of evidence are to be believed they indeed would refute Shaw's testimony and would prove that Tiche could not have been in Pittsburgh at these times. The difficulty is that the only testimony pertaining to these evidentiary items is Tiche's own.

He maintains that he stamped the data sheets in a time clock device at State College, Pennsylvania at the times indicated on those sheets. He could have falsified the sheets or had someone else stamp them. In this regard, we also note the counter-arguments proposed by the government to the effect that a greater number of time-stamp entries appear to fall on days when Shaw placed the defendant in Pittsburgh, than on other days throughout the year.

He claims that he made the entries in his calendar contemporaneously with the occurrence of the events recorded, but his keeping a record of events in the pocket calendar was a sometime thing. He did not keep a record or diary consistently.

He testified that he was present when his wife called her father June 20, 1971, which was Fathers' Day. We note that defendant did not call his own home on Fathers' Day though his family was very close, nor did he

further substantiate in any way that he actually was present when his wife made the phone call to her father on June 20th.

We resolve these issues of credibility against the defendant.

## IV

### Separate Offenses versus Single Indictable Offense

Defendant argues that if he participated in a conspiracy then the counts of the indictment do not present separate offenses but rather only a single indictable offense.

█ He also asserts that he cannot be found guilty of separate offenses because he was an "outside party." It is clear that individual participants in a mail fraud scheme are liable for acts of agents and co-conspirators unless there is some affirmative withdrawal on the part of the former, and this specifically includes defendant's responsibility for letters which another member of the scheme caused to be mailed in execution of the scheme. *United States v. Cohen,* 516 F.2d 1358 (8th Cir. 1975); *United States v. Joyce,* 499 F.2d 9 (7th Cir.), cert. denied 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974), respectively.

█ It is clear that the charges against defendant refer to separate specific mailings of letters in addition to the conspiracy. Each mailing in violation of § 1341 is a separate offense. See *United States v. Joyce* supra; *United States v. Anderson,* 466 F.2d 1360 (8th Cir. 1972). It is also clear that the charge of conspiracy is a separate offense from the charges involving the mailings themselves. We reject defendant's argument on this point.

## V

### Admissibility of Co-conspirators' Hearsay Statements

Defendant argues that the court should not have admitted into evidence the hearsay testimony of Campisi, as to conversations between himself and Nick Kerna, an unindicted co-conspirator, now deceased. According to Campisi, Kerna stated that

"Denny (meaning Tiche) would burn the building down." At a later time, according to Campisi, Kerna told him that he had hired Tiche to destroy the building.

Defendant contends that such hearsay is inadmissible for three reasons: 1) because none of Kerna's statements implicating defendant relate to mail fraud but only to arson; 2) because the government did not prove that defendant knew of the mail fraud before introducing the evidence; and 3) because the government did not establish that Kerna's statements satisfy the conditions of Fed.R.Evid. 801(d)(2)(E), which provides in part that a statement is not hearsay if

". . . (2) . . . the statement is offered against a party and is . . . (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

Defendant contends that his Sixth Amendment right to confront adverse witnesses against him has been denied as a result.

█ We hold that the evidence adduced at the trial established the existence of a conspiracy to defraud insurers. Once the government has established the existence of a conspiracy, then "slight evidence may be sufficient to connect a defendant with it." *United States v. Kates,* 508 F.2d 308, 310 (3 Cir. 1975). In addition, once the existence of a conspiracy has been established, hearsay statements made by an alleged co-conspirator may properly be considered against defendant. *United States v. D'Amato,* 493 F.2d 359 (2 Cir.), cert. denied 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974); *United States v. DeLazo,* 497 F.2d 1168 (3 Cir. 1974). This is true even where the existence of the conspiracy is only established by a fair preponderance of the evidence. *United States v. Wiley,* 519 F.2d 1348, 1350–51 (2d Cir. 1975), cert. denied sub nom. *James v. United States,* 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976).

█ The important consideration is the establishment by the prosecution of the existence of the conspiracy, which then per-

mits the declarations of co-conspirators to be used against the defendant; the order of proof is unimportant, as the co-conspirator's acts and declarations are not binding upon a defendant unless and until there is a *prima facie* proof of the conspiracy. *Klein v. United States*, 472 F.2d 847 (9th Cir.), reh. denied, March 2, 1973. While considerations of possible prejudice might require the *prima facie* case of conspiracy to be established before receiving into evidence extrajudicial statements of co-conspirators, see *United States v. Rodriguez*, 509 F.2d 1342, 1346 (5 Cir. 1975), which in any event is perhaps the most logical trial procedure, we do not consider a variance in this order of proof to have any significance in this non-jury trial.

The evidence establishes the existence of the conspiracy and defendant's participation therein. Kerna's statements, although hearsay, are admissible as a co-conspirator's declarations made during the course of the conspiracy and in furtherance of it. *United States v. Trowery*, 542 F.2d 623 (3d Cir. 1976). Defendant has suffered no prejudice to his Sixth Amendment rights, nor has there been any violation of Fed. Rule Evid. 801(d)(2)(E).

### VI

#### Conclusions of Law

The defendant, Dennis Richard Tiche, together with Carmello Campisi, Nick Kerna, Al White, Merrill Klein and John Shaw conspired to use the United States mails to defraud the Insurance Placement Facility of Philadelphia. This was a conspiracy to violate 18 U.S.C. § 1341 and was, of itself, a violation of 18 U.S.C. § 371.

As a member of the conspiracy defendant Tiche is responsible for all of the acts of all the other members of the conspiracy. It was part of the conspiracy that defendant Tiche would be paid to arrange to destroy a building to enable the conspirators to collect the insurance proceeds thereon.

As set forth in the Findings of Fact herein the mails were used on ten occasions in connection with obtaining the insurance policy and later with obtaining insurance proceeds on the destruction of the building, and these ten uses were each false and fraudulent in violation of 18 U.S.C. §§ 1341 and 2.

It was part of the conspiracy that defendant Tiche obtained dynamite, primer cord and blasting caps and carried them pursuant to their causing the building to be destroyed during the offense of mail fraud. This constituted a violation of 18 U.S.C. § 844.

The use by defendant Tiche of the dynamite, primer cord and blasting caps in connection with the commission of the offense of mail fraud violated 18 U.S.C. § 844(h)(i).

We conclude that the government has established beyond a reasonable doubt that defendant Tiche is guilty of conspiracy to commit mail fraud, ten counts of mail fraud, one count of unlawful carrying of explosive devices and one count of using explosive devices during the commission of a felony triable in the courts of the United States.

This opinion shall constitute findings of fact in accordance with Fed.R.Crim.P. 23(c), and this court's conclusions of law. An appropriate Order will be entered.