**UNITED STATES of America**

v.

**Buster OLIVER.**

**Crim. No. 75–82.**

United States District Court, E. D. Pennsylvania.

March 31, 1976.

James C. Schwartzman, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Stephen Robert LaCheen, Joel Harvey Slomsky, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

Presently before the Court are the defendant's motions for a Judgment of Acquittal and/or for a New Trial. On July 14, 1975, the jury returned a verdict of guilty to all five counts of the indictment charging the defendant in Count I with conspiracy to distribute heroin, in Counts II, III and IV with distribution of heroin, and in Count V with possession with intent to distribute heroin. The Court has determined that the defendant's motions are without merit and must be denied.

*Sufficiency of the Evidence in Connection with Conspiracy Count*

At trial, the Court denied the defendant's oral motion for a judgment of acquittal made after the government closed its case, which motion was based on the sufficiency of the evidence as to the conspiracy count (Count I). (N.T. 2–170). The defendant contends that this ruling was in error and that the government's evidence was insufficient as a matter of law to sustain his conviction in connection with the conspiracy count. In reviewing the denial of a motion for a judgment of acquittal, the pertinent question is whether the trial court had reason to believe that there was sufficient evidence on which the jury could find guilt beyond a reasonable doubt. *United States v. Leach,* 427 F.2d 1107 (1st Cir. 1970). It is not for the Court, ruling on a motion for a judgment of acquittal, to assess the credibility of a witness or to weigh the evidence. 2 *Wright,* Federal Practice and Procedure: Criminal, § 467 at 259. Rather, the court must view the evidence in a light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Armocida,* 515 F.2d 29 (3d Cir. 1975); *United States v. Pratt,* 429 F.2d 690 (3d Cir. 1970). If a conviction is based upon circumstantial evidence, the evidence need not be inconsistent with every conclusion save that of guilt, provided it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt. *United States v. Giuliano,* 263 F.2d 582 (3d Cir. 1959). Applying this test, and viewing the evidence most favorably to the government, we conclude that there was more than sufficient evidence for the jury reasonably to find the defendant guilty beyond a reasonable doubt.

Frank Lee, a Philadelphia police officer assigned to the Drug Enforcement Administration (DEA) Task Force, testified that on December 20, 1974, he was working in an undercover capacity attempting to make a drug purchase from

the defendant. (N.T. 1–72, 1–73). Officer Lee, together with Nathaniel Pittman, a government informant, drove to 19th and Columbia Streets in Philadelphia. They arrived at 19th and Columbia Streets at approximately 6:20 p. m. and parked their car outside of 1835 West Columbia Avenue. (N.T. 1–74, 1–75). Officer Lee and Mr. Pittman went into the defendant's variety store, located at that address, and proceeded to the rear of the store where they met the defendant.[1] (N.T. 1–75). Mr. Pittman then arranged for the defendant to sell Officer Lee and him ten bundles of heroin for $700.00. (N.T. 1–77). The defendant then led Mr. Pittman and Officer Lee to a room behind the rear of the store where Officer Lee paid the defendant $700.00. (N.T. 1–77, 1–78). Officer Lee testified that the defendant then called a young male named Ricky Brockington to him and instructed Mr. Brockington to go to the house and pick up "something." (N.T. 1–80). Mr. Brockington left the area and returned in four or five minutes holding a small carton. (N.T. 1–81). Mr. Brockington gave the carton to the defendant, who looked in the carton and handed it to Officer Lee. (N.T. 1–81). Officer Lee reopened the carton, examined its contents, placed them in his coat pocket, received an assurance from the defendant that it would be all right if he returned for a future transaction without Mr. Pittman and left the store. (N.T. 1–81). Testimony at trial then established that the substance given to Officer Lee by the defendant contained heroin. (N.T. 2–105).

Officer Lee next met the defendant on January 23, 1975, at his variety store at 1835 Columbia Avenue. (N.T. 1–89). Officer Lee discussed the purchase of additional heroin with the defendant and was instructed by him to return the next day. (N.T. 1–91). On January 24, 1975, Officer Lee again met with the defendant but was unsuccessful in his attempt to purchase additional heroin. (N.T. 1–91). The defendant and Officer Lee did, however, exchange telephone numbers for the convenience of both parties in connection with further drug transactions. (N.T. 1–91, 1–92). On January 31, 1975, at about 10:00 a. m., Officer Lee telephoned the defendant and negotiated another purchase of ten bundles of heroin for $700.00. (N.T. 1–92, 1–93, 1–97, 1–98). Pursuant to this telephone conversation, Officer Lee and a surveillance team went to the defendant's store at 1835 West Columbia Avenue on January 31 where Officer Lee met with the defendant. (N.T. 1–99). During this meeting Officer Lee told the defendant that he was interested in purchasing larger quantities of heroin and the defendant stated that he could supply any amount so long as the order was preceded by a telephone call. (N.T. 1–100, 1–103). Officer Lee then went to the rear of the store and gave the defendant $700.00. (N.T. 1–100, 1–101). The defendant called "Chuckie," the "bouncer," whose job it was to keep order in the defendant's store, and told "Chuckie," who was then in the rear of the store, to pick up ten "B's." (N.T. 1–102). Officer Lee testified that ten B's refers to ten bundles of heroin. (N.T. 1–102). "Chuckie" left the area and returned with a brown paper bag which he gave to the defendant. (N.T. 1–103). The defendant gave the bag to Officer Lee and Officer Lee examined its contents. (N.T. 1–103). Officer Lee discovered that one of the bundles contained only 24 bags, instead of the customary 25. Officer Lee told the defendant that one bundle was one bag short and the defendant called "Chuckie" back to the rear of the store and told "Chuckie" to "get Lee one single." (N.T. 1–104). "Chuckie" went to a closet and returned with one glassine bag in his hand and gave it to Officer Lee. (N.T. 1–105). Officer Lee put the paper bag in his

[1]. Oliver's Variety Store sells candy and cigarettes and has pinball machines and a pool table for the use of their patrons. Many of the patrons of the establishment are juveniles. (N.T. 1–101, 1–102).

pocket and asked the defendant to escort him to the front door, to which the defendant agreed. (N.T. 1–106).[2] Testimony then established that the substance received by Officer Lee from the defendant contained heroin. (N.T. 2–107).

On February 4, 1975, Officer Lee called the defendant's store and left a message asking that the defendant call him. (N.T. 1–110). The defendant returned the telephone call at approximately 5:30 p. m. on February 4th, and during that telephone conversation agreed to sell Officer Lee fifteen or twenty bundles of heroin. (N.T. 1–110, 1–111). Pursuant to the telephone conversation, Officer Lee arrived at the defendant's store at approximately 6:15 p. m. on February 4th. The defendant and Officer Lee met in the store and at the direction of the defendant proceeded to the Heart Bar located at 1829 West Columbia Avenue in Philadelphia. (N.T. 1–111, 1–112). As they walked in front of the defendant's store, the defendant instructed Officer Lee to move his car from in front of his store. (N.T. 1–112). Officer Lee moved his car and parked it on Gratz Street, a street which intersects Columbia Avenue near the defendant's variety store. Officer Lee then met "Chuckie" on Gratz Street and engaged him in a short conversation before watching him go into a house at 1714 Gratz Street. (N.T. 1–112, 1–113). Officer Lee proceeded to the Heart Bar where he met the defendant and told him that he wanted twenty bundles. (N.T. 1–114). A price of $60.00 per bundle or $1200.00 for twenty bundles was agreed upon. (N.T. 1–114, 1–115). The defendant stated that the heroin was coming from someone named Kenny who was from the area of Broad and Olney Streets in Philadelphia. (N.T. 1–117). The defendant then stated that his store had been raided and that was the reason that they were not meeting in the store. (N.T. 1–114). Officer Lee and the defendant also discussed the purchase of one hundred bundles of heroin, and the defendant stated that he could supply that large amount without any problem and that he had in fact handled several large orders that day. (N.T. 1–117, 1–118). Officer Lee stated that on February 4, 1975 the defendant was wearing a gold custom-made ring in which the initials "BO" ·were engraved in diamonds. The defendant, when asked by Officer Lee about the ring, stated "Yes, my woman got it, my woman copped it for me." (N.T. 1–123). Officer Lee testified that the above statement means that this woman "bought it." (N.T. 1–123). After this testimony by Officer Lee defendant was asked to raise his hand to determine whether he was wearing the ring. (N.T. 1–128). He was not. (N.T. 1–129).

After the discussion concerning the rings, the defendant and Officer Lee went to a telephone booth and the defendant made a telephone call to someone named Kenny. (N.T. 1–129). The defendant told Officer Lee that Kenny was on his way to make the delivery but perhaps he was going to the store instead of the Heart Bar. (N.T. 1–130). The defendant left the bar to find his contact. (N.T. 1–130). Officer Lee then went to the defendant's store and was informed by the defendant that Kenny was definitely en route. (N.T. 1–130). The two then returned to the Heart Bar. (N.T. 1–130). Once in the bar, the defendant told Officer Lee that the heroin had arrived and that one of the boys had been sent around the corner to pick it up. (N.T. 1–130). Shortly thereafter, "Chuckie" came into the bar and stood between Officer Lee and the defendant. (N.T. 1–131). Officer Lee told the defendant that he wanted to make the deal in the bar and did not want to get "Chuckie" involved in the transaction. (N.T. 1–132). The defendant instructed "Chuckie" to give him the bag and "Chuckie" reached inside the parka which he was wearing and gave the de-

2. Officer Lee testified that he requested the escort so that the surveillance team would get a good look at the defendant. (N.T. 1–106).

fendant a brown paper bag. (N.T. 1–132). The defendant and Officer Lee then went into the bathroom of the Heart Bar where the defendant gave Officer Lee twenty bundles for $1,200.00. (N.T. 1–132). The defendant and Officer Lee walked out of the bar together and Officer Lee watched the defendant go into the house at 1704 Gratz Street. (N.T. 1–132). The government established that the substance given to Officer Lee by the defendant on this occasion contained heroin. (N.T. 2–110).

On February 9, 1975, Officer Lee telephoned the defendant at his store to discuss the purchase of one hundred or more bundles of heroin. (N.T. 2–3). Officer Lee telephoned the defendant again on February 10, 1975, and made arrangements to meet the defendant at his store at approximately 11:00 a.m. on that date. (N.T. 2–4). After meeting the defendant in his store, Officer Lee and the defendant went to the Heart Bar to discuss the purchase. (N.T. 2–5). After some discussion the defendant agreed to sell Officer Lee two hundred bundles of heroin for $50.00 per bundle, or a total price of $10,000.00. (N.T. 2–5). The two principals agreed to consummate the transaction at the corner of Fox and Hunting Park Avenue in Philadelphia at approximately 10:00 p.m. that night. (N.T. 2–6). At 10:30 p.m. Officer Lee arrived at the intersection of Fox and Hunting Park Avenue and telephoned the defendant at the Heart Bar. (N.T. 2–7). The defendant stated that the heroin was not ready but that it might be by 12:00 midnight. (N.T. 2–9). The defendant gave Officer Lee another telephone number to call, which number was listed under Oliver's Tailor Shop located in the 1800 block of Columbia Avenue in Philadelphia. (N.T. 2–9, 2–10). At approximately 12:00 midnight Officer Lee placed another telephone call to the defendant at Oliver's Tailor Shop. The defendant told Officer Lee that he was ready to complete the transaction for one hundred bundles, but Officer Lee said that he wanted to complete the whole deal in one trip. (N.T. 2–10).

The defendant agreed to meet Officer Lee at 7:00 a.m. on February 11, 1975 to complete the purchase for two hundred bundles. (N.T. 2–11). Officer Lee called the defendant at 7:00 a.m. on February 11, 1975 and told him that he could not meet with him as planned but made arrangements to meet the defendant at 10:00 a.m. that morning in the Gino's parking lot at Broad and Columbia in Philadelphia. (N.T. 2–13). Officer Lee arrived at the Gino's parking lot at about 10:30 a.m. and immediately called the defendant at his variety store from a public telephone. (N.T. 2–14). Officer Lee returned to his car and shortly thereafter saw the defendant walking east across the parking lot carrying a big brown paper bag in his left hand. (N.T. 2–15). After entering the car with Officer Lee, the defendant directed him to drivè out of the parking lot. (N.T. 2–15). Officer Lee pulled out of the Gino's parking lot and headed south on Broad Street. (N.T. 2–16). After driving at about five or six miles per hour for one block, Officer Lee pulled into a parking space on Oxford Street. Officer Lee then looked into the bag and observed one hundred of the bundles as ordered. (N.T. 2–17). He told the defendant that he had to go to the trunk of his car to get the money to pay the defendant and got out of his car. (N.T. 2–17). As he exited his car, Officer Lee gave a prearranged signal and the surveillance car moved into position to assist in the defendant's arrest. (N.T. 2–17). The government then established that the substance in the possession of the defendant at the time of his arrest contained heroin. (N.T. 2–111, 2–113).

Nadie Jones, a Philadelphia police officer assigned to the DEA Task Force, testified that on December 20, 1974, he was assigned to the surveillance of Officer Lee and informant Pittman. (N.T. 2–145, 2–147). These duties took Officer Jones to 1835 West Columbia Avenue at approximately 6:20 p.m. on that date. (N.T. 2–146). He observed Officer Lee, Mr. Pittman and the defendant inside the defendant's store. (N.T. 2–147). Of-

ficer Jones then saw Ricky Brockington exit the store, walk north onto Gratz Street and return carrying a small box. (N.T. 2–148). On February 11, 1975, Officer Jones was again assigned to surveil Officer Lee. Officer Jones stated that he went to the Gino's parking lot at Broad and Columbia and saw the defendant walk across the parking lot carrying a large paper bag. (N.T. 2–150). He then saw Officer Lee and the defendant leave the Gino's parking lot and drive south on Broad Street. (N.T. 2–150).

Officer Walter Samuels, a Philadelphia police officer assigned to the DEA Task Force, testified that on January 31, 1975, he was in the area of 1835 West Columbia Avenue at 11:15 a.m. as part of the surveillance unit for Officer Lee. (N.T. 1–154). At 11:28 a.m. he observed "Chuckie" leave the defendant's store, walk north on Gratz Street, and return approximately five minutes later. (N.T. 2–155). On February 4, 1975, Officer Samuels was again at 1835 West Columbia Avenue. He observed Officer Lee and the defendant leave the defendant's store. (N.T. 2–156). The defendant went into the Heart Bar while Officer Lee moved his car and parked it on Gratz Street. (N.T. 2–156, 2–157). As Officer Lee got out of his car he was joined by "Chuckie." (N.T. 2–157). "Chuckie" and the defendant had a short discussion and upon departing "Chuckie" went north on Gratz Street and Officer Lee entered the Heart Bar. (N.T. 2–157). Officer Samuels then entered the Heart Bar and saw the defendant speaking on a public telephone. Officer Samuels then saw the defendant leave the bar and go into his store. (N.T. 2–158). Officer Samuels testified that the defendant reentered the bar and that at 8:15 p.m., Officer Lee and the defendant were joined by "Chuckie". (N.T. 2–159, 2–160). At 8:25 p.m., Officer Lee and the defendant entered the men's room of the Heart Bar, stayed a few minutes, and left the bar. (N.T. 2–160).

Officer John Buchanan, a Philadelphia police officer assigned to the DEA Task Force testified that on February 11, 1975, he was assigned to the surveillance of Officer Lee. Officer Buchanan set up surveillance of the defendant's store at 1835 West Columbia Avenue. At approximately 10:55 a.m., Officer Buchanan observed Ricky Brockington leave the defendant's store and walk north on Gratz Street. (N.T. 2–163). Officer Buchanan then observed the defendant leave his variety store and enter Oliver's Tailor Shop. (N.T. 2–163). A few minutes later, Ricky Brockington came back from Gratz Street carrying a paper bag and entered Oliver's Tailor Shop. (N.T. 2–164, 2–166). Shortly thereafter, both the defendant and Ricky Brockington left Oliver's Tailor Shop and proceeded east on Columbia Avenue. (N.T. 2–164). Mr. Brockington was still carrying the same brown paper bag when the two left the tailor shop. However, when they reached a small street before the Gino's parking lot located at Broad and Columbia, Mr. Brockington handed the defendant the brown paper bag. (N.T. 2–165). The defendant then proceeded with the brown paper bag to the Gino's parking lot where he met Officer Lee. (N.T. 2–165).

The defendant contends that under the facts of this case the evidence was insufficient to support a verdict of guilty as to the conspiracy count in that there was no evidence that either "Chuckie" or Ricky Brockington had any knowledge of the conspiracy's illicit purpose when they performed the acts described. The defendant contends that without proof of such knowledge a conviction for conspiracy cannot stand. There is no question that in order to sustain a conviction for conspiracy the evidence must be sufficient for the jury to reasonably infer that the alleged conspirator had knowledge of the conspiracy's illicit purpose when he performed the acts in furtherance of the illicit purpose. This requirement is set forth by our Third Circuit in *United States v. Klein*, 515 F.2d 751 (1975), in the following language:

> To support a conspiracy conviction, the government must show both an

agreement and a specific intent to achieve some unlawful goal. *United States v. DeCavalcante*, 440 F.2d 1264, 1275 (3d Cir., 1971); *United States v. Borelli*, 336 F.2d 376, 384 (2nd Cir., 1964). We do not dispute that a party who associates himself with an ongoing conspiracy may become a party to that agreement, either expressly by agreement or implicitly by acts done in furtherance of that conspiracy. *Direct Sales v. United States*, 319 U.S. 703, 709, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943); *United States v. Lester*, 282 F.2d 750, 753 (3d Cir., 1960). At a minimum, however, it must be shown that such a person has knowledge of the conspiracy's illicit purpose when he performs acts which further that illicit purpose. *Direct Sales, supra* ; *United States v. Salerno*, 485 F.2d 260, 263 (3d Cir., 1973); *United States v. American Radiator & Standard Sanitary Corporation*, 433 F.2d 174 (3d Cir., 1970). By acting in furtherance of the co-conspirators' goals with knowledge of the improper purpose, the jury can reasonably infer that the new member has achieved a tacit agreement with members of the ongoing conspiracy. Without knowledge of some improper purpose, the agreement, which is the heart of any conspiracy indictment, cannot be inferred from acts, even acts which further the purpose of the conspiracy. *United States v. Kates*, 508 F.2d 308 (3d Cir., 1975). 515 F.2d at 753 (footnotes omitted).[3]

The Court pointed out that such knowledge may be shown by circumstantial evidence "especially in a conspiracy case when direct evidence is likely to be scant." 515 F.2d at 754 (footnote omitted).

The defendant in this case was charged with participating in a conspiracy to distribute heroin. The evidence in this case, viewed in a light most favorable to the government, is clearly sufficient to establish that "Chuckie" and/or Ricky Brockington had knowledge that the defendant intended to distribute heroin, agreed to assist the defendant in the distribution of heroin, and performed acts to further that illicit purpose. As to "Chuckie", the evidence shows that on January 31, 1975, in order to complete a heroin purchase with Officer Lee, the defendant called "Chuckie" to the rear of his store and told "Chuckie" to pick up ten B's; that "Chuckie" left the store, walked north on Gratz Street, and returned carrying a brown paper bag which contained heroin; that upon the discovery by Officer Lee that one bundle was short one bag of heroin the defendant called "Chuckie" back to the rear of the store and told "Chuckie" to "get Lee one single;" that "Chuckie" went to a closet and returned with one glassine bag containing heroin and gave it to Officer Lee; that on February 4, 1975, while parking his car on Gratz Street, Officer Lee watched "Chuckie" enter 1714 Gratz Street, a residence also frequented by the defendant; that while Officer Lee and the defendant were in the Heart Bar on February 4, 1975, "Chuckie" came into the bar concealing a bag containing bundles of heroin inside his parka; and that "Chuckie" gave this bag to the defendant who in turn gave it to Officer Lee.

As to Ricky Brockington, the evidence shows that on December 20, 1974, the defendant called Mr. Brockington to the rear of his store and told him to pick something up from the house; that Mr. Brockington left the store, walked north on Gratz Street and returned in five minutes carrying a small carton which contained heroin; that the defendant gave the carton to the defendant who in turn gave it to Officer Lee; that on February 11, 1975, Mr. Brockington left the defendant's store and walked north on Gratz Street; that Mr. Brockington came back from Gratz Street carrying a brown paper bag containing heroin and entered Oliver's Tailor Shop, which the defendant had entered earlier; that both the defendant and Mr. Brockington left

---

**3.** *See also United States v. Johnson*, 513 F.2d 819, 823 (2d Cir. 1975).

the tailor shop with Mr. Brockington still carrying the paper bag; and that Mr. Brockington gave the defendant the bag before they arrived at the Gino's parking lot.

This evidence, though circumstantial, is clearly sufficient to permit a jury finding that the defendant conspired with "Chuckie" and Ricky Brockington, and that they both had knowledge of the illegal purpose of the conspiracy.

### Assertion by Informant of his Fifth Amendment Right Against Self Incrimination

Officer Lee testified that he was introduced to the defendant on December 20, 1974, by Nathaniel Pittman, a government informant. The defendant called Mr. Pittman in an effort to impeach the testimony of Officer Lee. After Mr. Pittman was brought into the courtroom and was read the oath, he stated that he was not going to give any testimony.[4] (N.T. 2–192). The Court immediately sent the jury from the courtroom and explained to the defendant his rights under the Fifth Amendment. (N.T. 2–192, 2–193). The Court then asked counsel for the defendant and the government if either of them wished to ask the witness any questions out of the presence of the jury. (N.T. 2–194). Defense counsel stated that he wanted to ask the witness some questions. The witness was sworn and the Court stated that it would determine whether there was any basis for the witness's assertion of the Fifth Amendment privilege. (N.T. 2–194, 2–195). When defense counsel asked whether the witness had been with the defendant and Officer Lee on December 20, 1974, the witness stated that he would not answer on the basis of his Fifth Amendment privilege. (N.T. 2–196). The Court immediately stated that it would appoint counsel for Mr. Pittman to advise him concerning his rights under the Fifth Amendment. (N.T. 2–197). Mr. Pittman stated that he had "no time" to be in court in connection with this case because he was presently incarcerated for violation of state parole and was scheduled to go on trial in federal court in Camden, New Jersey the next morning. (N.T. 1–198, 2–199, 2–200). Defense counsel then stated that Mr. Pittman had told him on the second day of trial, that he had never taken Officer Lee to the defendant's store and that this was the testimony which he sought from Mr. Pittman. (N.T. 2–205). It was agreed by counsel that neither the prosecution nor the defense expected that Mr. Pittman would refuse to testify on the basis of the Fifth Amendment. (N.T. 2–203).

After counsel was appointed for Mr. Pittman and was given an opportunity to confer with him, Mr. Pittman was brought back to the courtroom. (N.T. 3–2, 3–4, 3–5). Counsel for Mr. Pittman stated that Mr. Pittman still intended to invoke his Fifth Amendment privilege in connection with the events surrounding December 20, 1974. (N.T. 3–5, 3–8). Counsel for Mr. Pittman stated that the witness was currently under arrest but had not yet been indicted in the United States District Court for the District of New Jersey under charges of extortion and racketeering, charges relating to narcotics traffic. Counsel stated that part of the government's burden of proof in connection with such charges would be to show that the witness was involved with known narcotics traffickers. According to counsel for Mr. Pittman, the testimony sought by defense counsel from Mr. Pittman would establish that the witness was acquainted with those accused of trafficking in narcotic drugs. Counsel also pointed out that Mr. Pittman was currently under investigation and had in fact appeared in state court that morning in connection with a homicide charge which was related to the New Jersey charges. Finally, Mr. Pittman's court appointed counsel also pointed out that Mr. Pittman was

---

4. At the time of the trial, Mr. Pittman in state custody awaiting a hearing in connection with a parole violation. (N.T. 2–186).

currently being held in connection with an alleged parole violation and that his testimony would establish that during the period of his parole he was consorting with known criminals. (N.T. 3–7, 3–8, 3–10). After hearing from counsel for Mr. Pittman and giving counsel for the defendant and the government an opportunity to be heard, the Court ruled that, based upon the statements of Mr. Pittman's counsel, with which no one took issue, there was a basis in fact for Mr. Pittman's belief that by answering the questions in connection with the events surrounding December 20, 1974, he would expose himself to a substantial danger of incrimination. (N.T. 3–11).

In *United States v. Mahady & Mahady*, 512 F.2d 521 (3d Cir. 1975), our Circuit Court reiterated the circumstances in which a witness may invoke the privilege against self incrimination and the responsibility of the court when ruling upon a claim of privilege as follows:

The Supreme Court has specifically held that the privilege against self-incrimination may be invoked by a compelled witness *in any proceeding* when his answers to questions "might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973).

In so holding the Court said at page 77, 94 S.Ct. at page 322:

"The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself.' *The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal,* where the answers might incriminate him in future criminal proceedings." (emphasis supplied by Third Circuit).

It is also settled that "[t]he privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute *but likewise embraces those which would furnish a link in the chain of evidence* needed to prosecute the claimant for a federal crime." *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951) (emphasis supplied by Third Circuit); cited and applied in *Malloy v. Hogan*, 378 U.S. 1, 11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1954), and *In re U. S. Hoffman Can Corp.*, 373 F.2d 622, 628 (3d Cir. 1967).

*Hoffman v. United States, supra,* also held while the privilege "must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer," and "his say-so does not of itself establish the hazard of incrimination," it is the initial responsibility of the court "to say whether his silence is justified . . . , and to require him to answer if 'it clearly appears to the court that he is mistaken.'" 341 U.S. at 486, 71 S.Ct. at 818.

*Hoffman* cautioned that "if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee," and "[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." 341 U.S. at 486–487, 71 S.Ct. at 818.

*Hoffman* stressed that the self-incrimination privilege *"must be accorded liberal construction in favor of the right it was intended to secure."* 341 U.S. at 486, 71 S.Ct. at 818 (emphasis supplied by Third Circuit.)

We, too, have, in prior decisions, stressed that "a heavy duty rests on the judge before whom the privilege is invoked," and "[t]he trial court should not deem itself to be 'a mere keeper of the ring' in the tradition of the English civil law." 512 F.2d at 525. (footnotes omitted).

■ Defendant contends that there was no possibility that any answer given by Mr. Pittman could incriminate him. However, based upon the uncontradicted representation of Mr. Pittman's counsel, and the statements of Mr. Pittman, we find no error in our finding that there was a conceivable possibility that Mr. Pittman might tend to incriminate himself. *American Cyanamid Company v. Sharff*, 309 F.2d 790 (3d Cir. 1962).

The defendant also contends that the Court erred in making its decision that the answers to defense counsel's questions might tend to incriminate Mr. Pittman in the absence of an adequate record. The defendant cites *United States v. Anglada*, 524 F.2d 296 (2d Cir. 1975), in support of his argument. In *Anglada*, the Court reversed for the failure of the trial judge to give an entrapment instruction and suggested that in retrial the district court judge "take a harder look at any blanket assertion of [the] privilege . . . ." There was no discussion as to whether any hearing had been held. Likewise, in *United States v. Gomez-Rojas*, 507 F.2d 1213 (5th Cir. 1975), another entrapment case in which the Court held that the instruction was erroneous, the district court held no hearing but accepted the witness's bald assertion of the Fifth Amendment privilege. Here the court, before ruling on the asserted Fifth Amendment claim, held a full hearing out of the presence of the jury for the sole purpose of determining if there was a factual basis for

the claimed privilege. The Court gave counsel for both sides an opportunity to argue before the Court their respective positions before ruling on the claim of privilege. The defendant asked only that his objection be noted. (N.T. 3–10). The defendant did not contradict the representations of counsel for the defendant in connection with the charges pending against Mr. Pittman, nor did he suggest that more information concerning those charges should be obtained. The Court has determined that it had an adequate record before it on which to rule on the claimed Fifth Amendment privilege.

■ Defendant further argues that since Mr. Pittman was a government informant the government had a duty to try to convince Mr. Pittman to testify but made no effort to do so. The Court's research has revealed no case, nor has the defendant come forth with any authority for the novel proposition that the government has the further duty to convince a witness to testify when he asserts his Fifth Amendment privilege against self-incrimination. Indeed, it has been uniformly held that the government cannot be forced to grant immunity to a potential witness. *United States v. Berrigan*, 482 F.2d 171 (3d Cir. 1973); *United States v. Jenkins*, 470 F.2d 1061 (9th Cir. 1972), *cert. denied*, 411 U.S. 920, 93 S.Ct. 1544, 36 L.Ed.2d 313 (1973); *United States v. Lyon*, 397 F.2d 505 (7th Cir.), *cert. denied*, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968); *Morrison v. United States*, 124 U.S.App.D.C. 330, 365 F.2d 521 (1966); *Earl v. United States*, 124 U.S.App.D.C. 77, 361 F.2d 531 (1966). We therefore hold that Mr. Pittman had the right to assert his privilege against self-incrimination and that the Court properly ruled on his assertion of that right.[5]

5. The defendant argues that the testimony of the informant was "critical." While we do not belittle the importance to the defendant of contradicting Officer Lee's testimony in connection with the events of December 20, 1974, we note that the transaction which occurred on that night represented only one of the five counts, on each of which the jury found him guilty.

*Testimony of Prior Criminal Activity*

Defendant contends that certain testimony by Officer Lee contained references which suggested that the defendant was involved in other criminal activity. At trial the testimony of Officer Lee was as follows:

BY MR. SCHWARTZMAN:[6]

Q. When you went to the bar did you see Oliver?

A. I am pretty sure. I didn't go back to the store when I parked my car.

I went back to the bar and he was sitting at the bar and drinking something and orange.

Q. What did you do when you went into the bar?

A. Well, I went in and I took a seat and I think I asked him—and I think we started talking about my twenty bundles.

I told him I wanted twenty bundles then, I think, instead of fifteen.

I think we discussed that and then we discussed the price and we finally agreed on, I think it was, $60 a bundle because I was buying more now and I insisted on a lower price and I think we agreed on $60 a bundle while we were sitting at the bar, or $1200.

He told me that he had some trouble at the store, that it had been raided or something, and that's why he wasn't there when I got there.

Later Officer Lee testified as follows:

BY MR. SCHWARTZMAN:

Q. Officer Lee, did you observe what Mr. Oliver was wearing that day?

A. Yes, I did.

Q. What did he have on?

A. He had on a parka, green in color, I believe. He had a little hunting cap, I call them, a white cap, a

little corduroy thing with the big bill.

Q. Did he have any jewelry on?

A. Yes.

Q. What did he have on?

A. He had on a gold custom ring, custom-made, and he had the initials in it, BO, set in diamonds, very nice.

Q. Did you ask him anything—

MR. LA CHEEN:[7] Objection, Your Honor.

\*     \*     \*     \*     \*     \*

BY MR. SCHWARTZMAN:

Q. Did you have any conversation with Mr. Oliver about this ring?

A. Yes, I did, sir.

Q. What did you say to him and what did he say to you?

A. I said to him, "That's a fine-looking piece you got on your finger." He said, "Yes, my woman—" He said, "Yes, my woman got it, my woman copped it for me."

That means bought it.

BY MR. LA CHEEN:

Q. That means what?

A. That means purchased it or stole it, copped I am using, I am sorry.

After objection, the Court ordered the word "copped" stricken from the record and ordered the jury to disregard that testimony. (N.T. 1–128). The United States Attorney then asked the defendant to hold up his hand to determine whether he was wearing the ring described by Officer Lee. He was not. (N.T. 1–128, 1–129).

■ It is well established in this circuit that in a criminal prosecution "evidence of other offenses and prior trouble with the law is inadmissible . . . as part of the government's case against the defendant." *United States v. Hines*, 470 F.2d 225, 226 (3d Cir. 1975). However, as the Court stated in *United*

---

**6.** Prosecuting United States Attorney.

**7.** Defense counsel.

*States v. Stirone*, 262 F.2d 571, 576–577 (3d Cir. 1958), *rev'd on other grounds*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). The rule is qualified in the following manner:

> This rule is qualified by a number of exceptions stated in terms of the capacity of the evidence to prove some specific fact or issue such as intent, plan, scheme or design. But since the range of relevancy, other than for the purpose of showing criminal propensity, is almost infinite, we think the rule may be phrased a little less mechanically. Evidence of other offenses may be received if relevant for any purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime.
>
> Of course, the trial judge may, in the exercise of sound discretion, exclude evidence which is logically relevant to an issue other than propensity, if he finds that the probative value of such evidence is substantially outweighed by the risk that its admission will create a substantial danger of undue prejudice. (citations and footnotes omitted).

*See also United States v. Klein*, 515 F.2d 751, 755–756 (3d Cir. 1975); *United States v. Gimelstob*, 475 F.2d 157 (3d Cir. 1973); *United States v. Carney*, 461 F.2d 465, 467 (3d Cir. 1972).

■ Prior to February 4, 1975, all discussions and transactions between Officer Lee and the defendant had taken place in the defendant's variety store at 1835 West Columbia Avenue. However, on February 4, 1975, the defendant suddenly wanted to meet with Officer Lee in the Heart Bar and insisted that Officer Lee move his car from in front of the defendant's store. Even if the comment of Officer Lee that the defendant stated that his store had been raided could be construed as inferring that the defendant had been involved in other criminal activity, the testimony was clearly relevant to Officer Lee's testimony that these transactions occurred at the Heart Bar. The relevancy of this testimony by Officer Lee clearly outweighed any prejudice to the defendant that it may have created.

■ The testimony of Officer Lee in connection with the defendant's ring was relevant to substantiate the identity of the defendant as having sold Officer Lee heroin in the Heart Bar on February 4, 1975. In explanation of his use of the word "copped", Officer Lee stated that the word means "bought." Defense counsel then interrupted the direct examination and asked for a further explanation of the term. (N.T. 1–123).[8] In response to defense counsel's question, Officer Lee stated, "That means purchased or stole it. . . ." The defendant however contends that this comment was prejudicial and requires a new trial. We cannot agree. The statement is ambiguous in its reference to prior criminal conduct, particularly with respect to the defendant. The testimony in connection with the ring was clearly relevant to the case and the allegedly prejudicial comment was elicited by a question from defense counsel.[9] Furthermore, there was no error in requiring the defendant to display his hand to the jury in order to determine if he was still wearing the ring.

■ Finally, the defendant contends that the following exchange between defense counsel and Officer Lee was prejudicial to the defendant:

BY MR. LA CHEEN:

Q. And it is a normal part of your undercover activity to either pass yourself off as an addict or as a person dealing in drugs, isn't it?

A. Addict, you are pleading entrapment. No, sir, we don't pass ourselves off as addicts.

**8.** Defense counsel stated that he asked the question because he did not hear the original response of Officer Lee. (N.T. 1–125).

**9.** We note that after the Court ordered the word "copped" stricken from the record and instructed the jury to disregard it, defense counsel cross-examined Officer Lee in connection with the ring and his use of the word "copped." (N.T. 2–83 to 2–86).

The defendant asked that Officer Lee's remark be stricken, and the Court agreed to strike the remark. (N.T. 2–52). However, the defendant reconsidered and no further mention was made of the incident to the jury. (N.T. 2–53). The defendant contends that the remark was directed at the integrity of defense counsel and was prejudicial. While perhaps uncalled for, we cannot agree with the defendant's characterization of the remark and find no prejudice from this one slight reference to a possible legal defense.

Accordingly, the following Order is entered:

## ORDER

AND NOW, this 31st day of March 1976, it is hereby ORDERED that the defendant's motions for a judgment of acquittal and/or for a new trial are DENIED.