**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert Alan STITZER, and Glen Hollingsworth, Noel Van Wormer, a/k/a Noel Cobb, Richard Perna, Pedro Alfonso Sanchez-Paz, Jonathan Scott Baldwin, Defendants-Appellants.**

No. 84–5425.

United States Court of Appeals, Eleventh Circuit.

April 7, 1986.

George E. Becker, Chicago, Ill., for Hollingsworth, Stitzer and Perna.

Blas E. Padrino, Coral Gables, Fla., for Sanchez-Paz.

John F. O'Donnell, Ft. Lauderdale, Fla., for Baldwin.

Steve LeClair, Lurana Snow, Nancy L. Worthington and Stephen A. LeClair, Asst. U.S. Attys., Miami, Fla., for U.S.

Before HILL and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This criminal appeal involves five appellants, Jonathan Scott Baldwin, Pedro Alfonso Sanchez-Paz, Richard Perna, Glen Hollingsworth, and Robert Stitzer.

On September 7, 1983, appellants and eight other persons were charged in a thirty-five count indictment by a federal grand jury. Count I charged all of the defendants with conspiracy to possess multi-kilogram quantities of cocaine with intent to distribute in violation of 21 U.S.C. § 846. Appellant Jonathan Scott Baldwin was also charged in twelve counts of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (Counts 2, 4, 6, 8, 11, 14, 18, 19, 23, 26, 29, and 34); ten counts of distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) (Counts 3, 5, 7, 9, 12, 15, 20, 24, 27, and 30), and a single count of transporting a firearm in interstate commerce for the purpose of facilitating the possession for distribution of cocaine (Count 35). Appellant Perna was charged in a single substantive count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (Count 13). Appellant Sanchez-Paz was charged in four counts of possession with intent to distribute and three counts of distribution of cocaine in violation of 21 U.S.C. § 842(a)(1) (Counts 16, 17, 19, 20, 22, 23, and 24). Appellant Hollingsworth was charged in four counts of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (Counts 18, 25, 28 and 31). Appellant Stitzer faced one count of possession with intent to distribute and another count of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) (Counts 32 and 33). Defendant Marte was charged with seven counts of possession with intent to distribute cocaine (Counts 10, 13, 18, 21, 25, 28 and 31). Defendant Jones was charged with two counts of possession with intent to distribute cocaine (Counts 25 and 28). Defendant Van Wormer was charged with three counts of possession with intent to distribute cocaine; all in violation of 21 U.S.C. § 842(a)(1)(Counts 28, 31, and 34).

A jury trial commenced on April 16, 1984 and concluded on May 7, 1984. The jury found Sanchez-Paz and Perna guilty on all counts, Hollingsworth guilty of conspiracy and two of the substantive counts of possession with intent to distribute cocaine, but was unable to reach a verdict on the other two substantive counts. The jury found appellant Stitzer guilty of only the conspiracy charge. Appellant Baldwin pled guilty to four counts but subsequently tried unsuccessfully to withdraw his guilty plea. We affirm each appellant's conviction.

The evidence at trial warrant the jury's finding of the following facts, which are discussed as to each appellant.

## I. STATEMENT OF FACTS

In approximately March of 1979, Jonathan Scott Baldwin began to expand his cocaine distribution network. In the initial stage of the conspiracy, Baldwin met in Fort Lauderdale, Florida, with Owens Samuel Roberts, who, together with his partners, James Marte and Richard Perna, had been engaged in the distribution of marijuana through an auto dealership, P & M Motors in Downer's Grove, a suburb of Chicago, Illinois. At the meeting, Roberts explained that he and his partners wanted to expand into the cocaine business. He then purchased a pound of cocaine from Baldwin for between $24,000 and $26,000. Roberts took the cocaine back to Chicago, where he broke the package down into ounces, distributed it, and shared the profits with Marte and Perna.

After this initial transaction, Roberts made approximately fifteen additional trips to Fort Lauderdale to purchase cocaine from Baldwin. Usually, he received a pound of cocaine on each trip, and until the termination of their association in 1980, Roberts always split his profits with Marte and Perna, who occasionally provided Roberts with vehicles to travel from Chicago to Fort Lauderdale to pick up their cocaine. On his visits to Fort Lauderdale, Roberts sometimes stayed at a Howard Johnson Motel, located on Commercial Boulevard and North Federal Highway. His visits from September 14 to September 16, 1979; December 2 to December 3, 1979; March 27 to March 29, 1980; June 3 to June 4, 1980; and June 30 to July 1, 1980, each resulted in Roberts making cash payment to Baldwin for the previous shipment and obtaining a new delivery, generally of a pound of cocaine.

Roberts was one of a number of couriers employed by this network of distributors. In the summer of 1980, William Edward Jackson began his participation as a courier by taking eight ounces of cocaine from Baldwin to distribute in Connecticut. Upon his return to Fort Lauderdale, Jackson gave Baldwin $12,000 from the sale of that cocaine. Through his participation in the cocaine distribution network, Jackson came to know other couriers, such as Sam Roberts, who was making trips approximately once a month.

Roberts also met Jack Moncrief in the spring of 1980 at Baldwin's house when Moncrief was there to pick up a quantity of cocaine. Moncrief's involvement with the network dated back to 1978. At that time, he began purchasing cocaine from Baldwin four ounces at a time. He then resold the cocaine. The course of dealings was for Baldwin to advance Moncrief the cocaine at a price of $1,600 an ounce, and for Moncrief to take it back to his home in Houston. In approximately ten days, Moncrief would return to make the payment due and to obtain a new supply of cocaine. By his third or fourth trip, Moncrief began picking up a pound of cocaine on each trip. During the following ten years, he exchanged money for cocaine with Baldwin every two days to two weeks.

In the fall of 1980, Baldwin sent Jackson to Houston, Texas to deliver a pound of cocaine to Moncrief and an associate. Later that same year, Jackson made several trips to Chicago to deliver cocaine and pick up money from Perna and Marte at P & M Motors. On the first of these trips, Perna handed Jackson a package of money for Baldwin. On the second trip, Jackson delivered a pound of cocaine to Marte after driving to Chicago from Baldwin's residence in Fort Lauderdale in an automobile provided by Marte and Perna through their dealership. On the second trip, Marte examined the package from Jackson and rejected it because it did not appear to be of high enough quality.

Marte and Jackson then flew back to Fort Lauderdale to meet with Baldwin. Baldwin subsequently pressed the package of cocaine to make it appear to be of higher quality, and returned it. Now satisfied with the quality, Marte returned with the cocaine to Chicago.

On December 5, 1980, Baldwin sent Jackson and Moncrief to New Orleans by car. Once there, Moncrief flew on to Las Vegas with a pound of cocaine. Meanwhile, Jack-

son drove on to Hammond, Louisiana, where he left four ounces with Bill McConnell for further distribution. Jackson then went to Fayetteville, Arkansas where he was arrested while delivering eight ounces to several undercover police officers. Similarly, Jack Moncrief was arrested in Las Vegas while delivering Baldwin's pound of cocaine to undercover Las Vegas police officers.

On October 11, 1981, Stuart McLean met Frank Mirdjani at Miami International Airport. McLean took Mirdjani to Baldwin's residence, where Mirdjani purchased approximately four ounces of cocaine, which he took to Houston for further distribution. This transaction marked Mirdjani's first involvement in the conspiracy. He continued to work for Baldwin through August, 1982 when the conspiracy terminated.

On October 25, 1981, Mirdjani returned to Fort Lauderdale with the payment for the four ounces he had previously received. Baldwin, then introduced him to Marte and the three discussed their respective interest in the cocaine conspiracy. The next day, Mirdjani returned to Houston with another three to four ounces of cocaine which he delivered to Roy Marshall and Hugh Ivy. The following week, he again returned to Fort Lauderdale. This time, Baldwin introduced him to Bernie Marleau at the Fort Lauderdale Boat Show. Marleau admitted exchanging a boat known as the "French Touch" with Baldwin for a kilogram of cocaine, which Marleau exported to Canada.

In early November, 1981, Mirdjani and Baldwin travelled to Chicago with three kilograms of cocaine. The following day, they delivered the cocaine to Marte, Perna and Howard Jones at P & M Motors, where they were given an automobile bearing the dealership's license plate. Later, Marte delivered $100,000 to their hotel in payment for the cocaine.

Later that month, Baldwin and Mirdjani returned to Chicago. Marte met them at the airport and drove them to P & M Motors. There, they delivered cocaine to Perna, who, together with Marte and Baldwin, took it to the back room for storage. The following day, Mirdjani was again provided with a dealer car for his return trip to Houston.

In February or March of 1982, Baldwin visited Mirdjani in Houston. They delivered a pound of cocaine to Marshall and Ivy in exchange for $32,000. After consummating this deal, they drove three to four kilograms of cocaine to Chicago in a P & M dealer car and delivered it to Jones at the dealership.

A few weeks later Mirdjani again went to Fort Lauderdale and stayed overnight at Baldwin's house. The following morning, he was awakened by Baldwin, Marte, Glen Hollingsworth, and Pedro Alfonso Sanchez-Paz, counting approximately $1,000,000 in cash and packaging it in baby bottle liners. This money was the down payment for eighty-four kilograms of cocaine which Sanchez-Paz had agreed to deliver to Baldwin. Fifty kilograms was present at the house that morning. After counting the money, Sanchez-Paz, Hollingsworth, and Baldwin took the money and some guns to Sanchez-Paz's car. Sanchez-Paz then left. Later Marte and Hollingsworth took some of the cocaine to Chicago, with the understanding that Hollingsworth would return later with payment for this shipment.

Later in March of 1982, Mirdjani and Baldwin made another trip to Chicago. This time they met with Sanchez-Paz in a hotel room. Marte joined the meeting and received two kilograms of cocaine. After finding the quality unacceptable, he was given another two kilograms. The group then proceeded to a nearby parking lot where Sanchez-Paz displayed seven to eight kilograms of cocaine. Baldwin and Sanchez-Paz later drove to Wisconsin with that cocaine.

In early April 1982, Mirdjani flew to San Francisco, where he met and stayed with Baldwin for several days. They then drove to Los Angeles, where they met with Sanchez-Paz in expectation of receiving eleven kilograms of cocaine. This meeting proved unproductive, so they left the car supplied

by P & M at the Los Angeles Airport and flew back to Fort Lauderdale.

Nearly a week later, Mirdjani and Sanchez-Paz met at Baldwin's house where Sanchez-Paz delivered approximately three kilograms of cocaine. Mirdjani took the three kilograms to Chicago and delivered them to Jones at P & M Motors. Shortly after this trip, Mirdjani was called at his home by Baldwin, Hollingsworth, and Marte in succession. Each asked him to travel to Los Angeles to retrieve the car that he and Baldwin had left at the airport. To cover his expenses for this trip, Hollingsworth telexed $1,000 to Mirdjani.

Mirdjani retrieved the car and drove it to Houston. Baldwin then went to Houston from Fort Lauderdale, and with Mirdjani, drove the car back to Chicago along with another two to three kilograms of cocaine which they delivered to Perna and Jones at P & M Motors. Shortly after arriving in Chicago, Mirdjani, Hollingsworth, and Noel Van Wormer delivered that shipment of cocaine to Battle Creek, Michigan.

In July of 1982, Mirdjani drove to Chicago and met with Baldwin, Hollingsworth, Marte, Van Wormer, Jones and Jackson at a motel where Baldwin displayed between six and eight kilograms of cocaine. Mirdjani, Marte, Van Wormer and Jackson then delivered the cocaine to Michigan.

The following month, Mirdjani went to Fort Lauderdale on two occasions. Each time, he met with Baldwin and Robert Stitzer, one of Baldwin's sources for cocaine. In early August, 1982, Baldwin and Mirdjani followed Stitzer to a storefront location in Fort Lauderdale where Stitzer gave them a box containing between three and four kilograms of cocaine. That night, Van Wormer arrived in Fort Lauderdale. She and Baldwin negotiated the delivery of a quantity of cocaine, and she received six or seven ounces.

During that same month, Baldwin and another associate, David Siegel, began negotiations for the delivery of another quantity of cocaine to be supplied by Stitzer. Siegel introduced Baldwin to James Poynter. They told Poynter, a confidential informant for the Broward Sheriff's Department, that they could supply as much as two hundred kilograms of high quality cocaine. Further negotiations developed between Siegel and undercover deputies, which resulted in an agreement to deliver fifteen kilograms of cocaine to the officers on November 29, 1982, for a total price of $727,500.

On the appointed date, Baldwin and Stitzer met at Siegel's home. Stitizer outlined the method of dealing and confirmed his trust in Siegel. Stitzer then confirmed his ability to supply as much as 200 kilograms of cocaine. Later that morning, as previously agreed, Baldwin drove to Stitzer's home and picked up the first five kilograms. When he returned to Siegel's residence, he displayed the cocaine to the undercover officers. Thereupon, Siegel and Baldwin were arrested.

## DISCUSSION

Only five of the members of the cocaine conspiracy are parties to this appeal. Addressing the appellants seriatim, we consider only those claims which merit discussion. We begin with the kingpin of the conspiracy, appellant Baldwin.

## BALDWIN

Baldwin appeals the trial court's denial of his motion to withdraw his guilty plea and his motion for an evidentiary hearing.

Shortly after trial began, Baldwin requested that his attorney, Mr. Entin, attempt to negotiate a plea with the government. This request prompted Mr. Entin to seek an in chambers conference to bring to the trial court's attention what he considered to be extraneous and improper influences on Baldwin's decision to seek a plea agreement.

This conference was held on April 20, 1984 at 11:00 a.m. Mr. Entin told the trial court that Baldwin's decision to seek a plea agreement came as a complete surprise to him, as Baldwin had earlier expressed a desire to have a complete and vigorous defense. He then expressed his belief that

Baldwin's co-appellants and/or their attorneys had threatened or coerced Baldwin into changing his plea. In support of this belief, Mr. Entin informed the court that Mr. Guinan, who represented several of the defendants, had met with Baldwin over his objection.

Since Baldwin was not present during the conference, Mr. Entin expressed his desire to have him speak to the court about the matters which Mr. Entin had relayed. The trial court indicated that it intended to "thresh [out]" the matter in open court.

At 1:00 p.m. the same day, the trial court held a hearing to entertain Baldwin's change of plea. After an extensive colloquy, the court accepted Baldwin's plea of guilty to four counts.

On August 2, 1984, prior to sentencing, appellant filed a motion to withdraw his guilty plea and a motion to continue the sentencing hearing pending an evidentiary hearing on the motion to withdraw the guilty plea. The trial court denied both motions.

### 1. *Validity of Original Plea*

■ Federal Rule of Criminal Procedure 11 imposes upon a district court the obligation to conduct a searching inquiry into the voluntariness of a defendant's plea of guilty.[1] *United States v. Campbell,* 778 F.2d 764, 766 (11th Cir.1985) *Downs-Morgan v. United States,* 765 F.2d 1534, 1537–38 (11th Cir.1985). The nature of the inquiry varies from case to case. *United States v. Bell,* 776 F.2d 965, 968 (11th Cir.1985). Although there are no mechanical rules, the more complex or doubtful the situation, the more searching the inquiry. *United States v. Dayton,* 604 F.2d 931, 935

(5th Cir.1979) (en banc), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980). If the core concerns of Rule 11 are not satisfied, the plea is invalid.[2] Our initial task, therefore, is to determine whether the trial court conducted a plea taking inquiry sufficiently searching to satisfy the core requirements of Rule 11.

The trial court's Rule 11 inquiries fill approximately twenty-seven pages of the trial transcript. The trial court first asked the general question whether appellant was acting voluntarily. Appellant responded, "Yes." The court then asked the specific question whether appellant had been threatened to make him plead guilty. Appellant responded unequivocally, "No." The court then made even more specific inquiries to determine whether appellant had been threatened by the government, by any other person, "whether, defendants, lawyers, whatever." Again, appellant responded, "No, No."

■ Although the trial court did not ask specifically about Baldwin's conversation with Mr. Guinan, it did ask Baldwin whether he had been threatened by any lawyer. To us, these questions differ in form only, not in substance. When addressed to a defendant who is impressed with the obligation to swear truthfully, the question whether the defendant had been threatened by *any* lawyer would elicit the same response as the question whether a defendant had been threatened by a *particular* lawyer. To allow Baldwin to replead on the ground that the trial court did not sufficiently "thresh out" the possibility that his plea was coerced would be to elevate form over substance, contrary to the spirit of Rule 11. *See United States v.*

---

**1.** Federal Rule of Criminal Procedure 11(d) provides:

*Insuring That the Plea is Voluntary.* The court shall not accept a plea of guilty or nolo contendere without first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement. The court shall also inquire as to whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the attorney

for the government and the defendant or his attorney.

**2.** The three core concerns of Rule 11 are: (1) the guilty plea must be free from coercion; (2) the defendant must understand the nature of the charges; and (3) the defendant must know the consequences of his plea. *United States v. Dayton,* 604 F.2d 931, 935 (5th Cir.1979) (en banc), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980).

*Bell,* 776 F.2d 965, 971 (11th Cir.1985) (matters of substance, not form, govern review of Rule 11 proceeding.) Thus, we hold that the trial court satisfied Rule 11, and therefore that Baldwin's original plea was valid.

### 2. *Rule 32(d) Motion to Withdraw Guilty Plea*

Although Rule 11 governs the validity of a guilty plea, Rule 32(d) provides that a plea which is valid when made may nevertheless be withdrawn if the interest of justice so requires. *United States v. Campbell,* 778 F.2d 764, 767 (11th Cir.1985). Specifically, Federal Rule of Criminal Procedure 32(d) provides that if a defendant moves to withdraw the plea prior to sentencing,[3] "the court *may* permit withdrawal of the plea upon the showing by the defendant of any fair and just reason." (emphasis added.)

In view of the underscored permissive language, unless the denial of appellant's motion amounts to an abuse of discretion, we must affirm the trial court. To help us make this determination, we consider the three factors which the former Fifth Circuit articulated in *United States v. Pressley,* 602 F.2d 709, 711 (5th Cir.1979), (1) whether close assistance of counsel was available; (2) whether the original plea was knowing and voluntary; and (3) whether judicial resources would be conserved.

■ We find no abuse of discretion when we apply the *Pressley* factors to the facts of this case. First, appellant was ably represented by counsel during the original plea taking proceeding. Second, the trial court satisfied Rule 11's requirement of ensuring that appellant's plea was knowing and voluntary.[4] Third, retrying appellant would be a prodigal use of judicial resources in light of the fact that even without him, a central figure in the drug conspiracy, the trial lasted nearly a month. Based on these considerations, we affirm

the trial court's denial of the Rule 32(d) motion.

### 3. *Evidentiary Hearing on Motion to Withdraw*

Appellant argues that, at the very least, the trial court should have conducted an evidentiary hearing before ruling on his motion to withdraw his guilty plea.

■ In light of the extensive Rule 11 inquiries which the trial court made before accepting appellant's plea, we do not believe that its refusal to conduct an evidentiary hearing amounts to an abuse of discretion. *Cf. United States v. Russell,* 776 F.2d 955, 959 (11th Cir.1985) (no evidentiary hearing required on post-sentence motion to withdraw plea when Rule 11 inquiry demonstrates that plea entered voluntarily and knowingly.)

### *Appellant Sanchez-Paz*

Sanchez-Paz claims: (1) the trial court erred by denying his motion for judgment of acquittal; (2) the trial court erred by restricting appellant's cross-examination of a government witness; (3) the trial court erred in allowing into evidence telephone records containing extraneous markings; and (4) that he was denied effective assistance of counsel.

### 1. *Judgment of Acquittal*

Appellant contends that the trial court erred by not granting his motion for judgment of acquittal since his conviction was based solely on the uncorroborated testimony of an accomplice, witness Frank Mirdjani, who appellant believes is an incorrigible rogue.

The heart of the government's case against appellant Sanchez-Paz was the testimony of Frank Mirdjani. Appellant launches a blitzkrieg attack on Mirdjani's

---

**3.** Appellant filed his motion to withdraw his guilty plea after three of his co-defendants had been sentenced but prior to his own sentencing.

**4.** We give considerable weight to this factor. *See United States v. Barrett,* 514 F.2d 1241, 1243

(5th Cir.1975) (if the Rule 11 plea taking procedure is careful and detailed, the defendant will not later be heard to contend that he swore falsely.)

credibility. He argues that Mirdjani's testimony is altogether incredible because he: (1) was a co-conspirator; (2) had a prior criminal record; (3) received compensation and rewards including immunity from prosecution and protection from deportation to Iran in exchange for his testimony; (4) lied under oath on prior occasions; and (5) gave inconsistent versions of the facts in this case.

Although appellant concedes that "the determination of credibility and weight to be given evidence ordinarily falls within the province of the jury," he argues that "where a conviction is based on the uncorroborated testimony of an accomplice, the testimony must not be incredible or insubstantial on its face." In support of this proposition, appellant cites *United States v. Raffone*, 693 F.2d 1343 (11th Cir.1982) and *United States v. Darland*, 659 F.2d 70 (5th Cir.1981, *cert. denied*, 454 U.S. 1157, 102 S.Ct. 1032, 71 L.Ed.2d 315 (1982). He also cites *Tillery v. United States*, 411 F.2d 644 (5th Cir.1969), where the Court reversed a conviction based on the uncorroborated testimony of a co-conspirator.

The government responds by arguing that Mirdjani's credibility was purely a jury question and that in any event, his testimony was corroborated by documents admitted into evidence by stipulation. One such document was a record of telephone calls made by Sanchez. These records showed frequent communication between Sanchez and Baldwin, and also showed their presence in the same city and at the same hotel during the time periods described by Mirdjani.

Appellant does not respond directly to the government's corroboration argument, but instead argues that the records should not have been admitted because they contained extraneous markings. (We discuss this issue *infra.*)

■ Since we conclude that the records were admissible as evidence, we agree with the government that the corroborative evidence distinguishes this case from those which appellant cites.

■ Moreover, we do not find Mirdjani's testimony incredible or insubstantial on its face, notwithstanding the fact that he may not be beyond reproach. For a witness' testimony to be incredible as a matter of law "it must be unbelieveable on its face, i.e. testimony as to facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature." *United States v. Garner*, 581 F.2d 481, 485 (5th Cir.1978) (quoting *United States v. Cravero*, 530 F.2d 666, 670 (5th Cir.1976). *See United States v. Hewitt*, 663 F.2d 1381, 1385 (11th Cir.1981) (judgment of acquittal not required merely because government's case includes testimony by "an array of scoundrels, liars and brigands.") (quoting *United States v. Tiche*, 424 F.Supp. 996, 1000–01 (W.D.Pa.), *aff'd mem.* 564 F.2d 90 (3rd Cir.1977).

### 2. Cross-Examination as to Appearance of Hotel Room

While cross-examining Mirdjani, appellant sought to have him describe the hotel room in Chicago in which Mirdjani testified that he, appellant, and others met to carry out a drug deal. The trial court, however, sustained the government's objection on the grounds that such questioning was not relevant. It also refused appellant's request for a "side bar" or proffer.

Appellant contends that the hotel room in which he stayed at the O'Hare Hilton was not an ordinary room, and that Mirdjani's inability to describe the room would tend to prove that he was never in it and thus never witnessed a drug deal including appellant. In response, the government argues that the description of the room was irrelevant and wholly collateral.

■ We dispose of this issue by noting that Federal Rule of Evidence 611 leaves the extent of proper cross-examination within the sound discretion of the trial court. This discretion is broad enough to support the trial court's decision not to allow cross-examination as to a description of the hotel room. The potential for becoming altogether sidetracked from the

main issue is apparent, as a definitive description of the room might well have been provided only by a representative from the hotel establishment, which was located in Chicago.

### 3. *Admission of Telephone Records with Markings*

■ Appellant complains about the admission into evidence of telephone records which contained asterisks, dots, and lines next to selected calls. The telephone records were admitted under the "business record" exception to the hearsay rule. Appellant points out, however, that the extraneous markings, of unknown origin, were not part of the business records of the telephone company. According to appellant, these markings had the effect of admitting into evidence government exhibit 53 which the court had previously ruled inadmissible as hearsay. Exhibit 53 was a summary of phone calls which the government considered "significant."

The government responds that appellant has waived this issue by his failure to object below. Appellant argues that he was not aware of the markings until just before the case was sent to the jury and that he voiced his objection at that time, and requested that an unmarked copy be submitted to the jury.

Alternatively, the government contends that no reversible error has been committed since Special Agent Sack testified specifically about the significance of the telephone calls. Moreover, the government argues, the markings were doubtless of help to the jury.

We agree with the government's alternative argument that admission of the records with markings was not so prejudicial as to warrant reversal, if it was prejudicial at all.

### 4. *Continuance*

Appellant contends that the trial court's denial of his motion for continuance denied him the effective assistance of counsel.

He concedes, however, "... that the grant or denial of a continuance is a matter for the court's discretion." *See United States v. Warren*, 772 F.2d 827, 837 (11th Cir. 1985) (granting of continuance left to sound discretion of trial judge.) After reviewing the facts germane to this issue, we are convinced that appellant suffered no substantial prejudice as a result of the court's denying a continuance. Accordingly, we find no abuse of discretion.

### *Appellant Perna*

Perna lists a concatenation of reasons why his conviction should be overturned. Some have so little merit as to warrant no discussion at all. We turn now to those which do warrant our attention. Perna contends that: (1) the trial court erred by not granting his motion to suppress evidence seized in violation of the Fourth Amendment; (2) there was insufficient evidence to support his conviction; (3) there was a prejudicial variance between the indictment and evidence adduced at trial; (4) the trial court erred when it denied his motion for severance; (5) venue was improper in the Southern District of Florida.

### 1. *Motion to Suppress*

Appellant Perna appeals the trial court's denial of his motion to suppress a columnar pad and notebook seized at the time of his arrest.

Special Agent Timothy Sack arrested Perna at L.T.D. Motors, an automobile dealership located at 700 West Grand Avenue, Chicago, Illinois. When Sack arrived at the dealership, Perna was sitting behind his desk in his office. Perna's open briefcase was lying on the desk. One of the desk drawers was also open.

After arresting Perna, Sack noticed an accounting ledger pad with scraps of papers containing notations sticking out from the pad. He also saw a columnar pad and notebook in the open briefcase. In the open righthand drawer, he saw a receipt with the notation "handed to Scott."[5]

Sack recognized this as being a reference to

---

**5.** The government does not argue that Agent

Agent Sack seized all of these items. The government now seeks to justify the seizure on the basis of the plain view doctrine. It makes the general assertion that Agent Sack could tell that the seized items were drug related because of his investigation of this case and because of his experience.

■ We begin our analysis by noting that it is a basic constitutional rule that "searches outside the judicial process without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed. 576 (1967). One such exception is the "plain view" doctrine. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1968). Before a seizure can be justified under this exception, three conditions must be met. First, the seizing agent must lawfully be in a position to view the disputed evidence. Second, the agent must inadvertently discover the disputed evidence. Third, the incriminating nature of the disputed evidence must be apparent on its face. *Id.* at 464–73, 91 S.Ct. at 2037–42.

In its attempt to justify the seizure, the government quotes from *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983), "The plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost...." It then quotes from *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983). "The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity."

After recognizing the need for probable cause to associate the seized property with criminal activity, the government cites a number of cases in support of its contention that "[a] number of Courts of Appeal

have held that a plain view seizure of documents is permissible even though their incriminatory nature is not apparent absent some reading of their contents."

From this Circuit, the government cites *United States v. Slocum,* 708 F.2d 587 (11th Cir.1983); *United States v. Kent,* 691 F.2d 1376, 1384 (11th Cir.1982), *cert. denied,* 462 U.S. 1119, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983); *United States v. Antill,* 615 F.2d 648, 649 (5th Cir.1980). It also cites *United States v. Sheikh,* 654 F.2d 1057 (5th Cir., Unit A, 1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982).

■ Without analyzing the similarities and differences between this case and those cited, we conclude that it is not necessary for us to resolve this issue. We are fully satisfied that the evidence of guilt was sufficiently overwhelming that if we were to decide that admission of these items was error, it was harmless error beyond a reasonable doubt.

In addition to the questioned evidence, the government produced three witnesses who testified concerning Perna's involvement in this drug conspiracy. Witness Roberts testified that he frequently discussed the cocaine scheme with Perna during 1979 and 1980. Witness Jackson testified that he saw Perna meet with Baldwin on at least two occasions to pay for and pick up cocaine. Finally, witness Mirdjani testified that in November of 1981, he handed three kilograms of cocaine to Perna and watched Perna take it into the back room of his business establishment, P & M Motors.

Accepting as we must the credibility of the government witnesses, we have no doubt that their testimony alone provides firm support for appellant's conviction. Thus, we hold that in light of other overwhelming evidence of guilt, admission of the columnar pad and notebook into evidence, if in violation of the Fourth Amendment, was harmless error.[6]

---

appellant Jonathan Scott Baldwin. Nor do we make that assumption.

**6.** Our holding here makes it unnecessary for us to consider in a separate discussion appellant's

### 2. *Variance*

Appellant was convicted of being a part of a single, multifaceted conspiracy. He contends, however, that the evidence demonstrates a cluster of separate conspiracies, one between Baldwin and people in Texas, and one between Baldwin and people in Chicago, and one between Baldwin and people in Arkansas. In his reply brief, appellant outlines the existence of five separate conspiracies.

1. Texas/Nevada: Baldwin, Moncrief, Ivy, Marshall, Jackson and McClean;
2. Canada: Baldwin, Marlow, Hollingsworth;
3. Missouri: Baldwin and Jackson;
4. Florida: Baldwin, Siegel and Stitzer;
5. Illinois/Michigan: Baldwin, Marte, Perna, Van Wormer, Mirdjani; Sanchez. and Hollingsworth.

Appellant contends that Baldwin was the only common thread among these groups. He was the source of cocaine for each of these distributors. According to appellant, none of the groups was dependent upon the success of the other groups, nor did one group know of the other's existence.

■ Whether a scheme is one conspiracy or several is primarily a question for the jury. *United States v. Michel*, 588 F.2d 986, 995 (5th Cir.1979), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1980) (citation omitted.) "The evidence must be sufficient to show that each defendant had a general knowledge of the overall purpose and scope of the conspiracy, but it is not necessary that the conspirators know each other or the details of each enterprise making up the conspiracy." *Id.*

The government sums up its theory of the existence of a single conspiracy by arguing that "the essence of the conspiracy was the establishment of a systematic method of regularly distributing enormous quantities of cocaine throughout the United States." Under this theory, Baldwin was always the major distributor and the claim that there was insufficient evidence to

Marte-Perna partnership was a principal sub-distributor.

■ Viewing the evidence in the light most favorable to the government, we believe the jury reasonably could have found the existence of a single conspiracy with Baldwin as the central hub. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1978).

### 3. *Motion for Severance*

■ Our holding that the evidence supports the finding of a single conspiracy leads us to conclude that joinder of defendants was proper under Fed.R.Crim.Proc. 8(b). We therefore dispose of this issue without further discussion. We are not persuaded by appellant's contention that the court's denial of his motion led to undue prejudice. Thus, we do not find that the trial court abused its discretion under Federal Rule of Criminal Procedure 14. *See United States v. Rivera*, 775 F.2d 1559, 1569 (11th Cir.1985) (Absent compelling prejudice, persons indicted together should be tried together.)

### 4. *Venue*

Perna contends that venue did not properly lie in the Southern District of Florida as to Count 13 of the indictment, possession with intent to distribute cocaine.

■ The Sixth Amendment guarantees the right of a criminal defendant to be tried in the state and district in which the crime was committed. *See alsc* Fed.R. Crim.P. 18. In reviewing a claim of improper venue, we must ask "whether, viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility choices in favor of the jury verdict ... the Government proved by a preponderance of the evidence that the crimes occurred within the Southern District of Florida." *United States v. Males*, 715 F.2d 568, 569 (11th Cir.1983) (quoting *United States v. White*, 611 F.2d 531, 535 (5th Cir.), *cert. denied*, 446 U.S. 992, 100 S.Ct. 2978, 64 L.Ed.2d 849

support his conviction.

(1980)). This burden is met through the use of direct or circumstantial evidence. *United States v. Males,* 715 F.2d at 569; *United States v. Wuagneux,* 683 F.2d 1343, 1357 (11th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *United States v. Davis,* 666 F.2d 195, 199, 200 (5th Cir., Unit B, 1982).

 Since possession with intent to distribute is a continuing offense, venue is proper wherever the crime takes place, including the place of origin. *United States v. Gray,* 626 F.2d 494, 497–98 (5th Cir. 1980); *United States v. Cooper,* 606 F.2d 96 (5th Cir.1979).

On direct examination, witness Mirdjani testified that he and Baldwin travelled from Fort Lauderdale, Florida to Chicago with three kilograms of cocaine which they gave to appellant Perna at P & M Motors. Appellant argues that under cross-examination, Mirdjani testified that Baldwin bought the cocaine in Houston, and thus never possessed it in the Southern District of Florida.

Even assuming that Mirdjani did give two conflicting versions as to the origin of the cocaine, the jury reasonably could believe that Baldwin took the cocaine from Fort Lauderdale to Chicago, as he had done on numerous other occasions.

 Since we are obligated to make credibility choices in favor of the government, we hold that Mirdjani's testimony on direct examination that the cocaine which Perna is charged with possessing originated in Fort Lauderdale supports venue in the Southern District of Florida as to Perna.[7]

### Appellant Hollingsworth

Only three of appellant's numerous claims warrant explication. First, appellant challenges venue. Second, he contends that he was denied a speedy trial.

Third, he challenges the insufficiency of the evidence to support his conviction.

### 1. *Venue*

The government's case against Hollingsworth as to venue is circumstantial. Witness Mirdjani testified that in July of 1982 he met with Hollingsworth, Baldwin and others at a hotel in Chicago where Baldwin brought several kilograms of cocaine. Mirdjani did not know whether Baldwin brought the cocaine from Florida, nor did the government present evidence to this effect. Instead, the government relied on the inference that since Baldwin had taken cocaine from Florida to Chicago on several other occasions, he followed that same modus operandi on this occasion.

 As we noted in our discussion of appellant Perna's claims, venue can be proved by circumstantial evidence. Moreover, the standard of proof is preponderance of the evidence, rather than the more difficult standard of proof beyond a reasonable doubt.

The evidence shows that Baldwin went to the Chicago meeting from Florida. On numerous other occasions Baldwin transported drugs from Florida to Chicago. Appellant notes that Mirdjani testified that on a prior occasion he and Baldwin transported cocaine from Houston to Chicago. Thus, appellant argues the cocaine whose origin is disputed might well have come from Houston.

Mirdjani, however, did not testify that the cocaine whose origin is disputed came from Houston. Nor is there evidence that Baldwin stopped over in Houston enroute to Chicago.

 In the absence of testimony that this cocaine in fact originated in Houston, we believe the jury reasonably could have inferred that Baldwin brought the cocaine

7. Title 18 U.S.C. § 2 makes punishable as a principal one who aids or abets the commission of a crime. Aiding and abetting under this statute is not a separate crime but is inherently embodied in all indictments for substantive offenses. *United States v. Pearson,* 667 F.2d 12, 13

(5th Cir., Unit B, 1982) (per curiam). Thus, Baldwin's possession in the Southern District of Florida is attributable to co-conspirator Perna, since Perna aided and abetted that possession by virtue of his participation in the conspiracy.

from Fort Lauderdale, we he had done several times before. Since Baldwin's possession of the cocaine can be traced to the Southern District of Florida, the Southern District of Florida likewise is proper venue for the substantive count of possession with intent to distribute as to appellant Hollingsworth. *See* n. 8, *supra.*

### 2. *Speedy Trial*

In response to Hollingsworth's claim that his conviction should be dismissed because he was denied a speedy trial, the government argues that appellant failed to seek a mistrial or dismissal below, and thus is precluded from raising the issue here.

Although appellant did not move for a mistrial or dismissal on this ground, he did file a speedy trial demand on December 12, 1983. Trial did not begin until April 6, 1984.

The Speedy Trial Act provides that if a defendant is not brought to trial within the time limit required by § 3161(c) as extended by § 3161(h), the information or indictment shall be dismissed on motion of the defendant. 18 U.S.C. § 3162(a)(2). "Failure of the defendant to move for the dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section." *Id.*

■ We do not believe that appellant's demand for a speedy trial constitutes a motion to dismiss the indictment, for it did not bring to the trial court's attention the fact that appellant believed the Act had been violated. In effect, appellant sat on his hands below, allowed this lengthy case to be tried fully, and raises now for the first time the claim that the indictment should have been dismissed. Rather than allow appellant's "wait and see" tactic to prevail, we find that he has waived this objection.

### 3. *Insufficiency of Evidence*

Of appellant's three claims, we give this issue briefest consideration. Hollingsworth's principal contention is that the sole

witness against him, Frank Mirdjani, gave contradictory testimony as to his involvement in the drug conspiracy.

To resolve contradictory testimony is the very reason juries are empaneled. See our discussion as to appellants, Sanchez-Paz, *supra,* and Stitzer, *infra.* In short, we find the evidence sufficient to support appellant's conviction.

### *Appellant Stitzer*

Appellant Stitzer raises two issues worthy of discussion: ineffective assistance of counsel and insufficiency of the evidence.

### 1. *Ineffective Assistance of Counsel*

■ Appellant's trial lawyer was appointed by the Court after his first court appointed counsel withdrew. His second court appointed counsel filed a motion to withdraw. The court, however, denied counsel's motion.

Stitzer claims that counsel's inexperience resulted in his making several errors which combined to render appellant's assistance of counsel ineffective. In response, the government argues that Stitzer has waived this issue by failing to raise it below. Stitzer responds by arguing that because he had appointed counsel "... he had no say in what motions counsel prepared or filed, prior to, during or post trial." According to appellant, this explains why he failed to file a post trial motion raising ineffective assistance of counsel as a grounds for new trial.

This explanation, however, is too thin to support an exception to the now settled rule that claims of ineffective assistance of counsel may not be considered for the first time on direct appeal. *United States v. Griffin,* 699 F.2d 1102, 1107 (11th Cir. 1983); *United States v. Costa,* 691 F.2d 1358, 1363 (11th Cir.1982); *United States v. Stephens,* 609 F.2d 230, 234 (5th Cir. 1980). Because this issue is improperly before us, we decline to consider it on the merits.

### 2. *Insufficiency of Evidence*

Our consideration of this claim is governed by clear legal standards. *United States v. Sullivan*, 763 F.2d 1215 (11th Cir.1985):

> [T]he standard of review is whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." In prosecutions for conspiracy to distribute narcotics under 21 U.S.C. § 846, the essential element is an agreement by two or more persons to violate the drug laws. The existence of such an agreement may be proved by either direct or circumstantial evidence, including "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." A defendant may be found guilty of conspiracy if the evidence demonstrates that he knew the essential objective of the conspiracy, even if he did not know all of its details or played only a minor role in the overall scheme. *United States v. Walker*, 720 F.2d 1527, 1538 (11th Cir. 1983) (citations omitted), *cert. denied*, [465] U.S. [1108], 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984).

In considering the evidence, we must draw all reasonable inferences in favor of the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Although participation in a conspiracy may be proved by circumstantial evidence, *United States v. Tamargo*, 672 F.2d 887, 889 (11th Cir.), *cert. denied*, 459 U.S. 864, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982), mere presence, *United States v. Rozen*, 600 F.2d 494, 497 (5th Cir.1979), and mere association, *United States v. Correa-Arroyave*, 721 F.2d 792, 796 (11th Cir. 1983), are insufficient.

Stitzer contends that his conviction is based on mere association and mere presence and that the only evidence produced at trial against him was the testimony of witness Siegel who, according to Stitzer, "testified that he thought Appellant was a source of cocaine due to statements made by Jonathan Scott Baldwin," and the testimony of witness Mirdjani who "testified that all of his knowledge of Appellant's alleged drug dealings came from the statements made by Baldwin."

We agree with the government that appellant distorts the testimony of Siegel. Contrary to Stitzer's claim that Siegel's testimony was based on hearsay, Siegel testified that he saw Stitzer bring a tinfoil-wrapped sample of cocaine to Baldwin's house in late October 1982.

Viewing the evidence as a whole, and in the light most favorable to the government, we find that a jury could have found beyond a reasonable doubt that appellant was guilty of conspiracy as charged in the indictment.

The judgments are AFFIRMED.